UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x
                                                    :

Peter Uddo,                                        :

                                :     Case No. 17-cv-3848

                  Plaintiff,            :

                                :

               -against-           :     **COMPLAINT**

                                :

Robert DeLuca and Kimberly DeLuca,        :

                                :     JURY TRIAL DEMANDED

               Defendants.        :

                                :

                                :

---------------------------------------------------------------- x

Plaintiff Peter Uddo, through his counsel, as and for his Complaint, alleges as follows upon personal knowledge concerning his own acts and upon information and belief concerning all others:

## NATURE OF ACTION

1.     Mr. Uddo brings this action against his nephew and niece, Mr. and Ms. DeLuca, after Mr. Uddo agreed to pledge his own assets so that Mr. DeLuca could obtain a $4.5 million credit line from Charles Schwab Bank to finance his business.

2.     Mr. Uddo always shared a close, personal relationship with his nephew and niece, and he wanted them to succeed in their business endeavors. Thus, Mr. Uddo made three loans between 2000 and 2011 to Defendants totaling $800,000, so that Mr. DeLuca could finance and grow his construction and development business. These loans were all repaid.

3.     Defendants knew that Mr. Uddo cared for, and trusted, them, and that he had acquired significant wealth from his own successful career operating an advertising firm.

4.     In July 2011, Mr. DeLuca asked Mr. Uddo for a $5 million loan to finance his business's purchase of land and construction of new houses. At Mr. Uddo's recommendation,

Mr. DeLuca applied for a line of credit from Schwab, with Mr. Uddo agreeing to pledge his and his wife's assets in a Schwab brokerage account as collateral for the line of credit. Schwab issued Mr. DeLuca a $4.5 million line of credit.

5.     Both Messrs. Uddo and DeLuca were listed as borrowers on the loan documents. But they entered into an oral contract under which Mr. DeLuca agreed to make all required payments under the line of credit, including interest and principal, and Mr. Uddo agreed to pledge his assets as collateral for the line of credit.

6.     Between 2011 and 2016, Mr. DeLuca drew down virtually the entire line of credit. Mr. DeLuca paid interest to Schwab, but he repaid little or no principal. When the loans matured in July 2016, Mr. DeLuca failed to pay the amount due to Schwab, and, as a result, Mr. Uddo was required to and did pay the amount due to Schwab in full.

7.     After Mr. Uddo paid Schwab, Mr. DeLuca acknowledged that he owed that amount to Mr. Uddo under their oral contract, and even made some small payments in partial satisfaction of this obligation in 2016 and 2017. But these payments ultimately stopped, and Mr. DeLuca still owes Mr. Uddo almost the entire $4.5 million.

8.     In June 2016, just before the loans under the line of credit matured, Mr. Uddo learned for the first time from Mr. DeLuca that Mr. DeLuca was so deeply in debt that he was effectively insolvent when they applied for and obtained the loan in July 2011 (and was still insolvent in June 2016). Mr. Uddo also discovered that, instead of using the proceeds from the line of credit to finance his business—as Mr. DeLuca represented was his intent to both Mr. Uddo and Schwab—Mr. DeLuca used most of the proceeds to satisfy debts to others and for personal expenses, including, upon information and belief, transferring proceeds to Ms. DeLuca,

who was aware of Mr. DeLuca's actions, and substantially assisted Mr. DeLuca in taking these actions.

9.      Indeed, in June 2016, Mr. DeLuca admitted for the first time to Mr. Uddo that, in July 2011 when they applied for and obtained the line of credit, Mr. DeLuca owed $5 million to creditors, many of which were suppliers that sold Mr. DeLuca goods for *past* projects. And (unknown to Mr. Uddo until recently) beginning just a month after obtaining the credit line, Mr. DeLuca began drawing down the credit line by writing hundreds of thousands of dollars' worth of checks to himself, rather than to his companies.

10.     Mr. Uddo justifiably relied on the absence of any disclosure by Mr. DeLuca that he was insolvent in July 2011, and his false representation that he planned to use the proceeds from the credit line to finance his business. Mr. Uddo never would have agreed to pledge his assets for Mr. DeLuca to obtain the credit line if he knew that Mr. DeLuca was deeply in debt to the point of being insolvent, or if he knew what Mr. DeLuca really planned to do with the money.

## THE PARTIES

11.     Plaintiff Peter Uddo is a citizen of Florida.

12.     Defendant Robert DeLuca is a citizen of New York, and a resident of Staten Island, New York. Mr. DeLuca is Mr. Uddo's nephew.

13.     Defendant Kimberly DeLuca is a citizen of New York, and a resident of Staten Island, New York. Ms. DeLuca is Mr. DeLuca's wife. She is also the daughter of Mr. Uddo's brother-in-law, and thus Mr. Uddo's niece.

## JURISDICTION AND VENUE

14.     This Court has personal jurisdiction over Defendants under Fed. R. Civ. P. 4(k)(1)(A) and N.Y. C.P.L.R. § 302(a).

15.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1), because there is diversity of citizenship and the matter in controversy exceeds $75,000.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1), because all Defendants reside in this District.

## FACTUAL ALLEGATIONS

**A.     Mr. Uddo's Earlier Personal Loans to Defendants**

17.     Mr. Uddo is seventy-nine years old, and currently retired. But before his retirement, he was a successful businessperson and, among other things, operated a profitable advertising firm. Throughout the course of his career, Mr. Uddo accumulated significant wealth, into the tens of millions of dollars.

18.     Mr. DeLuca was, and is, a contractor and developer in Staten Island. Mr. DeLuca's primary business includes building houses and then selling them. Ms. DeLuca works in Mr. DeLuca's business, handling sales and the business's finances. Mr. Uddo never worked in Mr. DeLuca's business, nor was Mr. Uddo ever in the real estate construction or development industry.

19.     Until recently, Mr. Uddo shared a close, personal relationship with Defendants. He trusted them, and wanted to see them succeed in their business endeavors. Defendants were aware that Mr. Uddo trusted and cared for them, and that he wanted them to succeed.

20.      Beginning in 2000, Mr. DeLuca asked Mr. Uddo to lend him money to help finance his business. Given his close relationship with Defendants and substantial personal wealth (of which Defendants were aware), Mr. Uddo was happy to help his nephew and niece.

21.      On March 24, 2000, Mr. Uddo loaned Defendants $200,000 to help finance Mr. DeLuca's business. This loan was documented in a one-page promissory note listing Mr. Uddo and his wife, Joyce Uddo, as the lenders and Defendants as the borrowers. A true and correct copy of this note, dated March 24, 2000, is attached as Exhibit A.

22.      Defendants ultimately repaid the principal of this loan. While the note required that Defendants pay quarterly interest, Defendants never paid any interest. Mr. Uddo never asked Defendants to pay the interest required by the note.

23.      In 2010, Mr. DeLuca again approached Mr. Uddo to loan him money to further help finance his business. Mr. Uddo agreed to do so. Because Defendants repaid the principal on the 2000 loan in full, Mr. Uddo trusted that they would do so again.

24.      On March 11, 2010, Mr. Uddo loaned Defendants $300,000 to further help finance Mr. DeLuca's business. This loan was documented in a one-page promissory note listing Mr. Uddo and his wife as the lenders and Defendants as the borrowers. A true and correct copy of this note, dated March 11, 2010, is attached as Exhibit B.

25.      With the 2010 loan still outstanding, on June 22, 2011, Mr. Uddo again loaned Defendants another $300,000 to further help finance Mr. DeLuca's business. This loan was also documented in a one-page promissory note listing Mr. Uddo and his wife as the lenders and Defendants as the borrowers. A true and correct copy of this note, dated June 22, 2011, is attached as Exhibit C.

**B.      Mr. Uddo Agrees to Pledge Collateral For a $4.5 Million Line of Credit for Mr. DeLuca to Finance His Business**

26.      As it turned out, this $600,000 was not enough for Defendants. In July 2011, Mr. DeLuca asked Mr. Uddo to lend him $5 million. Mr. DeLuca claimed that he needed the money to finance the purchase of land and the construction of new houses, all as part of his business. Upon information and belief, but unknown to Mr. Uddo until recently, Mr. DeLuca was so deeply in debt as to be insolvent at this time.

27.      While this loan request was substantially larger than Mr. DeLuca's previous requests, and even though Defendants had not paid back either of the $300,000 loans that Mr. Uddo already made to them, Mr. Uddo still wanted to help Defendants.

28.      Rather than make a personal loan, Mr. Uddo told Mr. DeLuca to arrange a bank loan from Schwab. Mr. Uddo maintained a large securities portfolio with Schwab (worth over $50 million in 2011), and Mr. Uddo told Mr. DeLuca that he would provide the collateral for this loan.

29.      On July 5, 2011, Messrs. Uddo and DeLuca applied for a $5 million line of credit from Schwab. A true and correct copy of this application, dated July 5, 2011, is attached as Exhibit D.

30.      At the request of Schwab, both Messrs. Uddo and DeLuca were listed as borrowers on the application. But both of them agreed that Mr. DeLuca was responsible for all payments, including principal and interest, to Schwab in connection with the line of credit, and that Mr. Uddo was only guaranteeing amounts loaned under the line of credit with his assets. Thus, as collateral, the application listed a Schwab brokerage account owned by Mr. Uddo and his wife.

31.     Messrs. Uddo and DeLuca both understood, based on conversations between them, that the purpose of this line of credit was to help finance Mr. DeLuca's business—specifically, to finance Mr. DeLuca's business's purchase of land and construction of new houses. Significantly, the application stated that the purpose of the line of credit was "Buying Land and Construction of Homes." In the application, Mr. DeLuca also represented that "the information provided in this application is true and correct as of" the date of the application, and that he understood that "intentional or negligent misrepresentation of the information contained in this application may result in civil liability and/or criminal penalties." Mr. DeLuca further agreed to notify Schwab "immediately and in writing if any material information provided in connection with this application changes." Upon information and belief, Mr. DeLuca never informed Schwab (or Mr. Uddo) that the purpose of the line of credit was not as stated in the application, but was instead to pay down existing debt. Upon information and belief, Mr. DeLuca never informed Schwab that he was insolvent. Nor did he inform Mr. Uddo at that time that he was insolvent.

32.     Mr. Uddo would not have agreed to provide the collateral for this line of credit, or loan money to Mr. DeLuca, if he knew that Mr. DeLuca was effectively insolvent, or that he would use some, or most, of the money for purposes other than his business's purchase of land and construction of new homes—such as the repayment of other debt and personal expenses. Mr. Uddo reasonably relied on Mr. DeLuca's false representations—made both orally to Mr. Uddo and in the loan application with Schwab—that the purpose of this line of credit was for Mr. DeLuca to finance his business's purchase of land and construction of new homes. This reliance was justifiable, because Mr. Uddo previously loaned Defendants money to help finance Mr.

DeLuca's business, and Mr. Uddo had no reason to suspect that Mr. DeLuca was insolvent, or that he would use the funds from this line of credit for other purposes.

33.     On July 11, 2011, Schwab responded to the application by letter, stating that it could not approve a $5 million line of credit, but that it could extend a $4.5 million line of credit, secured by Mr. Uddo's collateral. On July 12, 2011, Messrs. Uddo and DeLuca returned a countersigned copy of the letter, accepting Schwab's counteroffer. A true and correct copy of this countersigned letter, dated July 11, 2011 and countersigned on July 12, 2011, is attached as Exhibit E.

34.     On July 12, 2011, Messrs. Uddo and DeLuca executed a promissory note with Schwab for this line of credit. Under the note, interest was due on a monthly basis, and the full principal amount (plus any other amounts still outstanding) was due no later than July 11, 2016. A true and correct copy of this note, countersigned by Schwab on July 14, 2011, is attached as Exhibit F.

35.     While both Messrs. Uddo and DeLuca are listed as borrowers on this note, Messrs. Uddo and DeLuca entered into an oral contract under which Mr. DeLuca agreed to make all required payments under the line of credit, including interest and principal, and Mr. Uddo agreed to pledge his assets as collateral for the line of credit. Schwab provided Mr. DeLuca with a checkbook and blank checks to use in drawing against the line of credit. At all relevant times, only Mr. and (upon information and belief) Ms. DeLuca had access to these checks, and only Mr. and (upon information and belief) Ms. DeLuca made withdrawals against the line of credit.

36.     On July 12, 2011, Mr. Uddo and his wife also signed a pledged asset agreement and collateral control agreement with Schwab, pledging a brokerage account they held with

Schwab as collateral for amounts loaned under the line of credit. True and correct copies of these agreements, countersigned by Schwab on July 14, 2011, are attached as Exhibit G.

37.     Further, on July 12, 2011, Messrs. Uddo and DeLuca signed a statement of purpose for the line of credit, which stated that the purpose of the line of credit was "Purchase Land and Construct Homes." Upon signing this statement of purpose, Mr. DeLuca certified that this information was "true, accurate, and complete." A true and correct copy of this statement of purpose, countersigned by Schwab on July 14, 2011, is attached as Exhibit H.

**C.     Mr. DeLuca Fails to Pay Back the Amounts He Drew On the Schwab Line of Credit**

38.     In July 2011, Defendants paid back the two $300,000 loans that Mr. Uddo made on March 11, 2010 and June 22, 2011. Upon information and belief, Defendants paid back these loans with proceeds from the Schwab line of credit.

39.     During the term of the line of credit, Mr. DeLuca made all the monthly interest payments, as he was required to do under the note with Schwab and his agreement with Mr. Uddo.

40.     During the term of the line of credit, Mr. DeLuca drew down virtually the entire line of credit. Consistently with his agreement with Mr. DeLuca, Mr. Uddo never drew any amounts from the line of credit.

41.     During the term of the line of credit, Mr. Uddo regularly asked Mr. DeLuca about his plan to pay down the amounts he borrowed under the credit line. Mr. DeLuca responded that his business was doing well, and that he would start paying back the principal soon. Indeed, Mr. DeLuca and his business were praised in a local Staten Island newspaper in December 2015. But Mr. DeLuca never paid any principal (or paid only very little principal) toward the credit line.

42.     When the loans matured in July 2016, Mr. DeLuca claimed that he was unable to pay Schwab the amount due under the credit line. As he was required to do by the agreements he signed with Schwab for Mr. DeLuca's line of credit, Mr. Uddo paid Schwab the full amount due under the credit line, which was $4,496,881.92. Further, to pay this amount, Mr. Uddo was forced to sell some of the securities that he pledged for the line of credit, and he incurred capital gains tax on those sales.

**D.     Mr. Uddo Discovers That Mr. DeLuca Took Proceeds from the Line of Credit for Personal Use and to Satisfy Past Debts**

43.     Unknown to Mr. Uddo until recently, upon information and belief and based on a recent conversation between Messrs. Uddo and DeLuca, Mr. DeLuca used most of the proceeds from the line of credit *not* to buy land or build new homes, as he represented he would do to both Schwab and Mr. Uddo, but for personal expenses and to satisfy debts that Mr. DeLuca owed to others. Upon information and belief, Ms. DeLuca also used, or assisted Mr. DeLuca in using, proceeds from the line of credit for personal expenses and to satisfy debts that Mr. DeLuca owed to others.

44.     Indeed, unknown to Mr. Uddo at the time, Mr. DeLuca drew over $2 million from the line of credit by writing checks to himself, and he began doing this within a month of obtaining the line of credit.

45.     Further, in June 2016—just before the loans matured—Mr. DeLuca admitted for the first time to Mr. Uddo (in the presence of Ms. Uddo) that, when Messrs. Uddo and DeLuca applied for and obtained the Schwab line of credit in July 2011, Mr. DeLuca owed $5 million to suppliers for goods they had sold to Mr. DeLuca for *past* projects, and that he was so deeply in debt at the time that Mr. DeLuca was effectively insolvent in July 2011. Mr. Uddo was unaware of Mr. DeLuca's financial status in July 2011, and continued to be unaware of it until Mr.

DeLuca admitted it to him in June 2016. Mr. DeLuca told Mr. Uddo that these past debts were the reason he could not pay back the amount due to Schwab under the line of credit, and that he had one creditor that was charging him a very high interest rate. Nor was Mr. Uddo aware of Mr. DeLuca's insolvency until Mr. DeLuca admitted it in June 2016.

46.     Mr. DeLuca also told Mr. Uddo during this June 2016 conversation that he did not want to declare bankruptcy, either then or in July 2011, because bankruptcy would ruin his reputation on Staten Island. Indeed, Mr. DeLuca drove a nice car, and he regularly threw fancy parties at his home and went on nice vacations. Upon information and belief, Mr. DeLuca's reputation as a successful businessperson was very important to him.

47.     After listening to Mr. DeLuca's admissions in June 2016, Mr. Uddo responded that, if he knew these facts in July 2011, he would not have agreed to pledge his assets in exchange for Mr. DeLuca's $4.5 million line of credit from Schwab.

48.     Upon information and belief, Mr. DeLuca transferred some, or all, of the proceeds from the line of credit to Ms. DeLuca. Upon information and belief, Ms. DeLuca knew of, and actively participated in, Mr. DeLuca's efforts to transfer these proceeds to her.

49.     Indeed, in June 2016, when Messrs. Uddo and DeLuca discussed Mr. DeLuca's plan (or lack of plan) to pay back the amounts he drew under the line of credit, Mr. DeLuca told Mr. Uddo to speak with Ms. DeLuca, because she handled his business's finances and would thus be knowledgeable about matters related to the line of credit.

50.     In a separate conversation in June 2016, Ms. DeLuca told Mr. Uddo that if Mr. DeLuca's business liquidated its assets and paid off all then-outstanding debts (including the approximately $4.5 million owed under the line of credit), the business would still be about $2

11

million short. Thus, according to Ms. DeLuca, Mr. DeLuca's business was insolvent in June 2016 as well.

51.     Of course, if Mr. Uddo knew Mr. DeLuca's real purpose in obtaining the line of credit or that Mr. DeLuca was insolvent when they applied for and obtained the line of credit in July 2011, Mr. Uddo would have never agreed to pledge his assets as collateral, or otherwise enter into the oral contract with Mr. DeLuca.

52.     Because Mr. Uddo paid the amount due under the line of credit to Schwab, he told Mr. DeLuca that Mr. DeLuca was required to pay that amount to him.

53.     Mr. DeLuca understood that it was his obligation to pay back the amount due under the line of credit to Schwab, and that, because he failed to do that, he was required to pay that amount to Mr. Uddo.

54.     Indeed, Mr. DeLuca paid to Mr. Uddo, in partial satisfaction of this obligation, $15,000 on August 26, 2016; $10,000 on October 17, 2016; $10,000 on January 25, 2017; $10,000 on March 15, 2017; and $10,000 on March 30, 2017. These payments show that Mr. DeLuca recognized that he was responsible for the amount due under the Schwab line of credit and that he was required to pay Mr. Uddo the amount that Mr. Uddo paid to Schwab.

55.     Further, as Mr. Uddo pressed Mr. DeLuca for payments of the amount due, Mr. DeLuca gave Mr. Uddo a list of properties that Mr. DeLuca was supposedly developing, and said that he would pay Mr. Uddo with the proceeds from these sales. But Mr. DeLuca stated that these properties were all subject to bank loans, which had to be paid first.

56.     Aside from the payments referenced above, Mr. DeLuca has not made any payments to Mr. Uddo toward the amount that Mr. Uddo paid to Schwab.

## FIRST CAUSE OF ACTION
### (Breach of Contract Against Mr. DeLuca)

57.     Mr. Uddo repeats the allegations above as if fully set forth herein.

58.     Messrs. Uddo and DeLuca entered into an oral contract under which Mr. DeLuca

agreed to make all required payments under the Schwab line of credit, including interest and

principal, and Mr. Uddo agreed to pledge his assets as collateral for the line of credit.

59.     The mutual exchange of promises between Messrs. Uddo and DeLuca was

sufficient consideration.

60.     Mr. Uddo fully performed his obligations under the contract by pledging his

assets as collateral for the line of credit.

61.     Mr. DeLuca failed to perform his obligations under, and thus breached, the

contract when he failed to pay Schwab the amount due under the credit line when the loans

matured.

62.     As a result, Mr. Uddo suffered damages in an amount to be determined at trial,

but no less than $4,441,881.92, which is the amount that Mr. Uddo paid to Schwab upon

maturity of the loans, less the amounts that Mr. DeLuca already paid to Mr. Uddo; plus damages

based on Mr. Uddo's incurrence of capital gains tax on the securities he sold to pay back the

loans in full; plus pre- and post-judgment interest.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty Against Mr. DeLuca)

63.     Mr. Uddo repeats the allegations above as if fully set forth herein.

64.     Because of their close, extended, personal and business relationship, Mr. Uddo

placed a high degree of trust in Mr. DeLuca. Mr. DeLuca accepted this delegation of trust by

continuing to seek additional loans from Mr. Uddo with full knowledge that Mr. Uddo felt that

he shared a close, personal relationship with Mr. DeLuca and wanted him to succeed in his

business endeavors. Thus, there was a continuing fiduciary relationship between Messrs. DeLuca

and Uddo, and as a result Mr. DeLuca owed fiduciary duties to Mr. Uddo at all relevant times.

65.     Mr. DeLuca breached his fiduciary duties to Mr. Uddo by failing to disclose his

insolvency in July 2011, by falsely stating that the purpose of the Schwab credit line was to

finance his business's purchase of property and construction of new houses, by using proceeds

from the Schwab credit line for other purposes—including to satisfy pre-existing debts owed to

others and for personal expenses—by transferring these proceeds to Ms. DeLuca, by failing to

pay Schwab when the loans matured, and by failing to pay Mr. Uddo the amount that Mr. Uddo

paid to Schwab.

66.     As a result, Mr. Uddo suffered damages as stated in paragraph 62 above.

## THIRD CAUSE OF ACTION
### (Fraud Against Mr. DeLuca)

67.     Mr. Uddo repeats the allegations above as if fully set forth herein.

68.     Mr. DeLuca did not disclose to Mr. Uddo that he was insolvent in July 2011.

Whether Mr. DeLuca was insolvent at the time Messrs. Uddo and DeLuca applied for and

obtained the $4.5 million Schwab line of credit was material to the oral contract between Messrs.

Uddo and DeLuca.

69.     Mr. DeLuca also represented to Mr. Uddo that the purpose of the Schwab line of

credit was to finance Mr. DeLuca's business's purchase of land and the construction of new

houses. The purpose of the line of credit was material to the oral contract between Messrs. Uddo

and DeLuca. This representation was false when made, and Mr. DeLuca knew that it was false

when he made it, because he intended to use a significant amount of the proceeds from the

Schwab line of credit for other purposes, including satisfying debts to others and for personal

expenses. Indeed, Mr. DeLuca started drawing on the line of credit by writing checks to himself (rather than to his businesses) within a month of executing the note with Schwab, and he owed $5 million to creditors in July 2011.

70.     Mr. DeLuca knew that Mr. Uddo cared for him and wanted him to succeed in his business endeavors. Mr. DeLuca also knew that Mr. Uddo had loaned Mr. DeLuca money before to help finance Mr. DeLuca's business. Thus, Mr. DeLuca knew that Mr. Uddo would only agree to pledge $4.5 million of his assets in exchange for the Schwab credit line if Mr. Uddo believed that Mr. DeLuca was solvent and needed the money to finance and expand his business. Therefore, Mr. DeLuca did not disclose his insolvency, and made this misrepresentation regarding the purpose of the line of credit, for the purpose of inducing Mr. Uddo to rely on this omission and misrepresentation.

71.     Mr. Uddo justifiably relied on the absence of any disclosure by Mr. DeLuca that he was insolvent in July 2011, and on his misrepresentation regarding the purpose of the line of credit. Indeed, Mr. DeLuca signed papers with Schwab stating that the purpose of the line of credit was to buy property and build new homes, and Mr. DeLuca represented and certified that this statement of the purpose of the line of credit was true. Further, Mr. DeLuca previously asked for, and received, loans from Mr. Uddo to finance Mr. DeLuca's business. Mr. Uddo thus had no reason to suspect that Mr. DeLuca was insolvent, or that he misrepresented the purpose of the line of credit. Mr. Uddo would not have entered into this oral contract if he knew that Mr. DeLuca was insolvent, or if he knew Mr. DeLuca's true purpose for obtaining the line of credit.

72.     As a result, Mr. Uddo suffered damages as stated in paragraph 62 above.

### FOURTH CAUSE OF ACTION
### (Fraudulent Inducement Against Mr. DeLuca)

73.     Mr. Uddo repeats the allegations above as if fully set forth herein.

15

74.     Mr. Uddo specifically repeats the allegations in paragraphs 68 and 69 above as if fully set forth herein.

75.     Mr. DeLuca knew that Mr. Uddo cared for him and wanted him to succeed in his business endeavors. Mr. DeLuca also knew that Mr. Uddo had loaned Mr. DeLuca money before to help finance Mr. DeLuca's business. Thus, Mr. DeLuca knew that Mr. Uddo would only agree to pledge $4.5 million of his assets in exchange for the Schwab credit line if Mr. Uddo believed that Mr. DeLuca was solvent and needed the money to finance his business. Therefore, Mr. DeLuca did not disclose his insolvency, and made this misrepresentation, for the purpose of inducing Mr. Uddo to rely on this omission and misrepresentation, and to thus enter into an oral contract under which Mr. DeLuca agreed to make all required payments under the line of credit, including interest and principal, and Mr. Uddo agreed to pledge his assets as collateral for the line of credit.

76.     Mr. Uddo specifically repeats the allegations in paragraph 71 above as if fully set forth herein.

77.     As a result, Mr. Uddo suffered damages as stated in paragraph 62 above.

### FIFTH CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty Against Ms. DeLuca)

78.     Mr. Uddo repeats the allegations above as if fully set forth herein.

79.     Mr. Uddo specifically repeats the allegations in paragraphs 64 and 65 above as if fully set forth herein.

80.     Upon information and belief, Ms. DeLuca knew that Mr. DeLuca breached his fiduciary duties to Mr. Uddo and substantially assisted Mr. DeLuca in breaching these duties by, among other things, using, or assisting Mr. DeLuca in using, proceeds from the line of credit for personal expenses and to satisfy debts that Mr. DeLuca owed to others, and by actively and

knowingly participating in Mr. DeLuca's efforts to transfer proceeds to her from the line of

credit with the knowledge that these proceeds would not be used by Mr. DeLuca to pay Schwab

or Mr. Uddo.

81.     As a result, Mr. Uddo suffered damages as stated in paragraph 62 above.

## SIXTH CAUSE OF ACTION
### (Tortious Interference With a Contract Against Ms. DeLuca)

82.     Mr. Uddo repeats the allegations above as if fully set forth herein.

83.     Mr. Uddo specifically repeats the allegations in paragraphs 58-61 above as if fully

set forth herein.

84.     Upon information and belief, Ms. DeLuca knew about this contract between

Messrs. Uddo and DeLuca, and intentionally and wrongfully induced Mr. DeLuca to, and

assisted Mr. DeLuca in, breaching this contract by, among other things, using, or assisting Mr.

DeLuca in using, proceeds from the line of credit for personal expenses and to satisfy debts that

Mr. DeLuca owed to others, and by actively and knowingly participating in Mr. DeLuca's efforts

to transfer proceeds to her from the line of credit, all with the knowledge that these proceeds

would not be used by Mr. DeLuca to perform his obligations under the contract.

85.     As a result, Mr. Uddo suffered damages as stated in paragraph 62 above.

**WHEREFORE**, Plaintiff Peter Uddo respectfully requests that this Court enter judgment

in his favor against Defendants Robert DeLuca and Kimberly DeLuca on all of his Causes of

Action, awarding him damages in an amount to be determined at trial—but no less than

$4,441,881.92, which is the amount that Mr. Uddo paid to Schwab upon maturity of the loans,

less the amounts that Mr. DeLuca already paid to Mr. Uddo; plus damages based on Mr. Uddo's

incurrence of capital gains tax on the securities he sold to pay back the loans in full; pre- and

17

post-judgment interest; attorneys' fees and costs of prosecuting his claims; and such other and

further relief as may be just and proper.

## <u>JURY DEMAND</u>

Plaintiff Peter Uddo demands a trial by jury on all issues that are so triable.

Dated: New York, New York
       June 27, 2017


By: /s/ Richard H. Dolan
Richard H. Dolan
Douglas E. Grover
Samuel L. Butt
Joshua Wurtzel
26 Broadway
New York, New York 10004
Telephone: (212) 344-5400
Facsimile:  (212) 344-7677
E-Mail: rdolan@schlamstone.com
E-Mail: dgrover@schlamstone.com
E-Mail: sbutt@schlamstone.com
E-Mail: jwurtzel@schlamstone.com

*Attorneys for Plaintiff Peter Uddo*