**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

PETER UDDO,

                    Plaintiff,

                v.

ROBERT DELUCA AND KIMBERLY DELUCA,

                    Defendants.

Case No. 1:17-cv-03848 (NG) (LB)


**DEFENDANTS' POST-TRIAL MEMORANDUM OF LAW**


Judd R. Spray, Esq.
LAW OFFICE OF JUDD R. SPRAY
450 Seventh Avenue, 33rd Floor
New York, New York 10123
(347) 409-0211
*Attorney for Defendants Robert DeLuca*
*and Kimberly DeLuca*

August 9, 2019

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................... ii

PRELIMINARY STATEMENT .................................................................. 1

ARGUMENT .............................................................................................. 5

I.  Mr. Uddo Failed To Prove Breach of Any Oral Agreement. ............... 5

    A.  There Was No Oral Agreement. ..................................................... 5

    B.  Any Oral Agreement Would Have Been Immediately
        Extinguished and Superseded By the Promissory Note................... 8

    C.  The Alleged Oral Agreement Violates the Statute of Frauds. ......... 10

II.  Mr. Uddo Failed To Prove Any Claim for Fraud or Fraudulent Inducement. ....... 11

    A.  There Is No Cause of Action for Fraudulent
        Inducement To Contract Where There Is No Contract..................... 12

    B.  Mr. Uddo's Fraud Claims Seek Identical Damages to
        His Contract Claim and Should Therefore Be Dismissed. ............... 12

    C.  Mr. Uddo Failed To Prove any Actionable
        Misrepresentation or Omission by Mr. DeLuca. ............................. 15

        1.  Mr. DeLuca Did Not Misrepresent His
            Intended Use of the Schwab Credit Line. ............................... 16

        2.  Mr. Uddo Did Not Reasonably Rely on any Omission by
            Mr. DeLuca Concerning His Financial State in July 2011. ......... 19

III.  Mr. Uddo Failed To Prove Any Breach of Fiduciary Duty,
     or the Aiding and Abetting of Any Such Breach................................. 23

CONCLUSION .......................................................................................... 26

i

**TABLE OF AUTHORITIES**

**Cases**

**Page**

*Birnbaum v. Birnbaum,*
    73 N.Y.2d 461 (1989) ........................................................................................25

*Board of Managers of 250 Bowery Condominium v. 250 VE LLC,*
    2018 NY Slip Op. 31168(U) .......................................................................13, 14

*Crigger v. Fahnestock and Co., Inc.,*
    43 F.3d 230 (2d Cir. 2006) ................................................................15, 19, 21

*Cron v. Hargro Fabrics, Inc.,*
    91 N.Y.2d 362 (1998) ........................................................................................10

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,*
    343 F.3d 189 (2d Cir. 2003) ............................................................................20

*Empire Outlet Builders LLC v. Construction Resources Corp. of New York,*
    170 A.D.3d 582 (1st Dep't 2019) ...................................................................14

*Express Indus. and Terminal Corp. v. New York State Dep't of Transp.,*
    93 N.Y.2d 584 (1999) ..........................................................................................7

*FIH, LLC v. Foundation Capital Partners, LLC,*
    920 F.3d 134 (2d Cir. 2019) ..............................................................................8

*Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,*
    748 F.2d 729 (2d Cir. 1984) ............................................................................20

*Guilbert v. Gardner,*
    480 F.3d 140 (2d Cir. 2007) ............................................................................10

*Manas v. VMS Assoc., LLC,*
    53 A.D.3d 451 (1st Dep't 2008) .....................................................................14

*Mallis v. Bankers Trust Co.,*
    615 F.2d 68 (2d Cir. 1980)...............................................................................20

*Martin, Delicatessen, Inc. v. Schumacher,*
    52 N.Y.2d 105 (1981) ..........................................................................................7

*MBIA Ins. Corp. v. Credit Suisse Secs. (USA) LLC,*
    165 A.D.3d 108 (1st Dep't 2018) ...............................................................13, 14

<u>**TABLE OF AUTHORITIES (CONT'D)**</u>

<u>**Cases**</u>

<u>**Page**</u>

*Mobil Oil Corp. v. Rubenfeld*,
   72 Misc.2d 392 (N.Y. Civ. Ct. 1972)..............................................................23

*Mosaic Caribe, Ltd. v. AllSettled Group, Inc.*,
   117 A.D.3d 421 (1st Dep't 2014) ..............................................................13

*Peltz v. SHB Commodities*,
   115 F.3d 1082 (2d Cir. 1997) ..............................................................20

*Register.com, Inc. v. Verio, Inc.*,
   356 F.3d 393 (2d Cir. 2004) ..............................................................7

*Schlaifer Nance & Co. v. Estate of Warhol*,
   119 F.3d 91 (2d Cir.1997)..............................................................15

*Snyder v. Wells Fargo Bank, N.A.*,
   594 Fed.Appx. 710 (2d Cir. 2014)..............................................................25

*TJ PRP LLC v. Rag & Bone Holdings LLC*,
   2018 NY Slip Op. 31880(U)..............................................................13

*Triad Int'l Corp. v. Cameron Indus., Inc.*,
   122 A.D.3d 531 (1st Dep't 2014) ..............................................................13

*U.S. v. Chestman*,
   947 F.2d 551 (2d Cir. 1991)..............................................................23, 24, 25

*U.S. v. Reed*,
   601 F. Supp. 685 (S.D.N.Y. 1985) ..............................................................23

<u>**Statutes**</u>

N.Y. Gen. Oblig. Law § 5–701(a)(1)..............................................................10

<u>**Other Authorities**</u>

Black's Law Dictionary (5th ed. 1979)..............................................................24

Restatement (Second) of Agency § 395 (1958)..............................................................24

**PRELIMINARY STATEMENT**

In 2011, Defendant Robert DeLuca tried to expand his Staten Island homebuilding operation with borrowed money. His uncle, Plaintiff Peter Uddo, helped Mr. DeLuca secure a five-year, $4.5 million line of credit from Charles Schwab, and pledged millions of dollars of his own Schwab stock portfolio as collateral. Mr. Uddo did not first ask Mr. DeLuca to enter into a separate contract with him. He did not ask to review Mr. DeLuca's tax returns, or to see his companies' balance sheets. He did not even ask Mr. DeLuca if he had any other debt (despite knowing that, at a minimum, Mr. DeLuca already owed **him** $600,000). Mr. Uddo simply pledged his collateral as a favor to Mr. DeLuca and his wife, Defendant Kimberly DeLuca, with no strings attached.

Mr. Uddo's favor was in keeping with prior actions, as when he lent the DeLucas $200,000 in 2000: "And I loaned them $200,000. No questions asked. They asked me, you know, they needed the money and I just gave it to them."

The DeLucas repaid that loan.

In March 2010, Mr. Uddo lent the DeLucas another $300,000, and in June 2011, he lent them another $300,000. When asked at trial why he lent the DeLucas this money, Mr. Uddo answered, "Because they asked me for it."

The DeLucas repaid those loans as well.

In 2011, when Mr. DeLuca sought to access a larger line of credit to buy more properties and build more homes, Mr. Uddo pledged several millions dollars of his own collateral with literally no questions asked: "I never asked [the DeLucas] to show me statements. I never asked them to show me like they would their income tax returns. I – I just trusted them. They said that they needed it and I gave it to them, just like I always did."

Unfortunately for everyone involved, this was the first of their uncle's favors that the DeLucas could not repay. Mr. DeLuca made all interest payments on the Schwab Credit Line, on time, for five years. In 2016, however, when the credit line matured, Mr. DeLuca could not repay the $4,488,000 that he had borrowed. Mr. Uddo, whose pledged collateral was at risk, paid off the outstanding debt.

Mr. Uddo's actions—before he filed this lawsuit—are consistent with his testimony that he became an extraordinarily successful, wealthy businessman by viewing "trust" as a guiding principle. In his own words: "I always conducted my business, in essence, in a way of trust. . . . Well, I grew up with the fact that if you don't trust anyone, I mean, there's no sense doing any business. I mean, that's the essence of running a business and that's the essence in life, life in general."

But now Mr. Uddo wants his money back. Now Mr. Uddo is not concerned with trust, but with finding a way to prove some claim in this lawsuit, despite having pledged the collateral for the Schwab Credit Line without securing any legal recourse against either of the DeLucas. As the trial demonstrated, he cannot do it. This unhappy family dispute does not belong in federal court, or any court, because Mr. Uddo simply cannot prove the elements of any claim against Mr. or Mrs. DeLuca.

Mr. Uddo has nevertheless pursued a transparently lawyer-driven strategy involving an alleged oral agreement concocted to circumvent the draconian provisions of the actual written documents governing the Schwab Credit Line. Mr. DeLuca's purported manifestation of assent to this fabricated oral agreement concerning a $4.5 million commitment was "No problem, Uncle Pete." The truth is that there was no oral agreement, and certainly not one that could have survived the Schwab Credit Line documents or the Statute of Frauds.

2

Mr. Uddo next claims that he was defrauded by Mr. DeLuca. His alleged fraud damages are identical to his alleged breach of contract damages, and his fraud claims fail for that reason alone. They fail for the additional reasons that he cannot identify any actionable misrepresentation or omission and cannot demonstrate reasonable reliance in any event. Before pledging his assets to Schwab, Mr. Uddo never even asked Mr. DeLuca if he had other outstanding debts, despite knowing that Mr. DeLuca owed $600,000 just to him, including $300,000 that Mr. DeLuca had borrowed the previous month. Mr. Uddo, a sophisticated businessman, had a duty to at least ask Mr. DeLuca about his financial condition. Having failed to do so, he cannot claim fraud based on Mr. DeLuca's alleged failure to disclose his other debts.

Mr. Uddo's breach of fiduciary duty claims fare no better. There was no fiduciary duty running from Mr. DeLuca to his older, wealthier, more successful uncle. Even if there were, the breach of fiduciary claim is just another repackaging of Mr. Uddo's breach of contract, and fails for that reason. And even if Mr. Uddo that Mr. DeLuca had breached some fiduciary duty to him—he did not—Mr. Uddo presented no evidence that Mrs. DeLuca somehow aided and abetted any such breach. There is some evidence indicating that Mrs. DeLuca contributes to the operation of RKD Enterprises and DeLuca Homes of Staten Island, businesses that she sometimes refers to as "ours." There is **no** evidence that Mrs. DeLuca knowingly induced or participated in any breach of any duty to her uncle.

The major tragedy of this lawsuit is that the Uddo/DeLuca family has been ripped apart. The minor tragedy is that Mr. Uddo's meritless claims were never challenged on a pre-answer motion to dismiss or a post-discovery motion for summary judgment. Mr. Uddo has therefore wasted a small fortune of his own pursuing legal claims that were dead on arrival. Now he has

also wasted three full trial days proving irrelevant trivia like the fact that the DeLucas sometimes shop at the Top Tomato supermarket on Staten Island.

Mr. Uddo did not prove that the DeLucas "betrayed" him, because they didn't. They did not stash funds from the Schwab Credit Line in any offshore account. They did not use the funds to pay back the substantial sums they owe to other relatives. They did not live like royalty for five years, despite Mr. Uddo's best attempt to portray certain trappings of modern middle class life as displays of unfathomable extravagance. What the evidence showed is that Mr. DeLuca used the Schwab funds exactly the way he said he would: to repay his outstanding debt to Mr. and Mrs. Uddo and to buy properties, build homes, and generally seek to expand his homebuilding operation.

Mr. DeLuca got in over his head and failed to use the Schwab Credit Line to build a profitable business. Mr. DeLuca is hardly the first builder to lose borrowed money. But he did not breach any oral agreement with his uncle, he did not defraud his uncle, and he did not breach any fiduciary duty to his uncle.

Mrs. DeLuca, who spent much of the five-year life of the Schwab Credit Line caring for her aging grandmother—Mr. Uddo's wife's mother—never should have been brought into this lawsuit in the first place.

Mr. Uddo's counsel gave the game away when he acknowledged that Mr. Uddo seeks judgments against the DeLucas that cannot be discharged in bankruptcy. Mr. Uddo's desire for fraud-based judgments is no substitute for evidence of fraud. Mr. Uddo proved neither the breach of any oral agreement nor any tortious act by either of the DeLucas, and the Court should therefore rule in Defendants' favor on all of Mr. Uddo's claims.

## ARGUMENT

**I.     Mr. Uddo Failed To Prove Breach of Any Oral Agreement.**

Mr. Uddo's first claim is for breach of an alleged oral agreement between himself and Mr. DeLuca concerning the Schwab Credit Line. (First Amended Complaint ¶¶ 57-62.) Mr. Uddo claims that "Mr. DeLuca agreed to make all required payments under the Schwab line of credit, including interest and principal, and Mr. Uddo agreed to pledge his assets as collateral for the line of credit." (*Id.*) The evidence at trial demonstrated that there was no such agreement between the two men; that even if any oral agreement had actually been formed in the lobby of Schwab's office, it would have been immediately extinguished and superseded by the written contract governing the Schwab Credit Line that Mr. Uddo and Mr. DeLuca entered into a few minutes later; and that even if the alleged oral agreement described by Mr. Uddo could somehow survive the written contract, it was unenforceable under the Statute of Frauds.

**A.     There Was No Oral Agreement.**

As a dispositive, threshold issue, the alleged conversation between Mr. Uddo and Mr. DeLuca, as described by Mr. Uddo at trial, does not even rise to the level of an oral agreement.

Mr. Uddo was given numerous opportunities at trial, on both direct and cross-examination, to describe the oral agreement he allegedly entered into with Mr. DeLuca. He described a purported exchange he had with Mr. DeLuca at Schwab's office in Morristown, New Jersey, shortly before the two men signed documents to access the Schwab Credit Line. (*See* Defendants' Proposed Findings of Fact ("PFF"), dated August 9, 2019, ¶ 89.) And each time, he described the same discussion in essentially the same terms:

Q.     And what happened during this discussion?

5

A.     I said to him, now that you guys have this loan, and I'm putting up the collateral, you're responsible to pay it off and Robert's response was: Don't worry, Uncle Pete.

(PFF ¶ 90.)

Q.     You mentioned this a little bit before. What if any agreement did you have with Robert DeLuca regarding who was responsible for paying this loan back?

A.     I told him that I was putting up the collateral so they could – they could receive money on this loan and that you know they – make sure that they pay off the loan and don't hang me up on this and he said don't worry about it.

(PFF ¶ 90.)

Q.     From your earlier testimony, I believe that the oral agreement was that some time shortly prior to applying for the loan from Schwab you said to Mr. Deluca[,] ["]if I'm going to post the collateral for this money you better pay it back[,"] and Mr. DeLuca said to you something to the effect of ["]no problem, Uncle Pete?["]

A.     Correct.

Q.     Is that correct?

A.     Correct.

Q.     Is that the entire oral agreement between you and Mr. DeLuca?

A.     Yes.

       MR. WURTZEL: Objection to the form.

       THE COURT: Overruled.

Q.     Is there any other provision—is there any other part of this oral agreement that's not included in the paraphrase I just gave?

A.     Well, I said that you and Kimberly have this loan. I think you must have heard the whole thing because you just took part of it out. You and Kimberly, okay, have this loan, I'm putting up the collateral, just make sure that you pay it off because don't leave me on the hook. That's in essence what I said.

6

Q.      That's your best recollection as to what you said to Mr. DeLuca?

A.      Yes.

Q.      And he said to you –

A.      **Don't worry Uncle Pete.**

Q.      -- don't worry Uncle Pete?

A.      **And that gave me confirmation that he's going to pay off the loan.**

(PFF ¶ 90 (emphasis added).)

Even assuming that the conversation took place exactly as Mr. Uddo describes it, this exchange fails to satisfy the most basic requirements for the formation of an enforceable agreement. "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004). "Mutual assent is essential to the formation of a contract and a party cannot be held to have contracted if there was no assent or acceptance." *Id.* Put differently, "[t]o create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. and Terminal Corp. v. New York State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999). New York's Court of Appeals has held that "[i]mpenetrable vagueness and uncertainty will not do." *Id.* (quoting *Martin, Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (1981)).

Mr. DeLuca's purported response—"Don't worry, Uncle Pete"—falls far short of the manifestation of assent required to bind Mr. DeLuca to the $4.5 million oral agreement alleged by Mr. Uddo. Mr. Uddo claims that Mr. DeLuca promised him—not Schwab—that he would pay off the Schwab Credit Line when it came due. That contention puts more weight on "Don't worry, Uncle Pete" than it can bear.

7

According to Mr. Uddo, he and Mr. DeLuca were minutes away from signing documents with Schwab whereby Mr. DeLuca would contractually bind himself to pay back to Schwab any funds that he drew down from the Schwab Credit Line. (PFF ¶ 89.) Mr. DeLuca intended to comply with his contractual obligation **to Schwab**, and therefore told his uncle not to worry. Mr. DeLuca did not thereby manifest his assent to become bound by a separate, additional, enforceable oral agreement that would make him liable **to Mr. Uddo** if he failed to meet his contractual obligations to Schwab. In none of Mr. Uddo's retellings did Mr. DeLuca manifest any assent to be contractually obligated to Mr. Uddo. He certainly did not manifest assent with sufficient definiteness "to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. and Terminal Corp.,* 93 N.Y.2d at 589.

### B.  Any Oral Agreement Would Have Been Immediately Extinguished and Superseded By the Promissory Note.

The Schwab Credit Line is memorialized in a "Pledged Asset Line Promissory Note" dated July 11, 2019 (the "Promissory Note"). (PFF ¶¶ 76-84.) Even if an oral agreement had been formed between Mr. Uddo and Mr. DeLuca in Schwab's lobby, it would have been immediately extinguished and superseded by the terms of the Promissory Note, which the two men signed a few minutes later. (PFF ¶ 89.)

"A merger clause is a provision of a contract signifying that the contract is a complete statement of the parties' agreement, superseding any prior oral or written terms. In other words, a merger clause operates to limit the universe of the parties' contractual obligations to the text of the contract itself." *FIH, LLC v. Foundation Capital Partners, LLC*, 920 F.3d 134, 143 (2d Cir. 2019).

The Promissory Note here contains a merger clause stating that "this Note and each other Loan Document constitute the entire agreement between the parties with respect to the subject

8

matter hereof and may be modified only by a written instrument executed by both Lender and the other parties hereto[.]" (PFF ¶ 83.) The subject matter of the Promissory Note is unquestionably the Schwab Credit Line, including the terms of Mr. DeLuca's obligation to repay any funds that he drew down from the Schwab Credit Line. Any alleged additional obligations that Mr. DeLuca might have had pursuant to his alleged oral agreement with Mr. Uddo were superseded by the Promissory Note. *FIH*, 920 F.3d at 143. In the Second Circuit's words, the Promissory Note limited the universe of Mr. DeLuca's contractual obligations with regard to the Schwab Credit Line to the text of the Promissory Note itself.[1] *Id.*

The Promissory Note also contains a Paragraph 15, titled "Waivers by Borrower Parties," which states:

> If more than one person, trust or trustee (each a "Borrower Party") comprises Borrower, to the extent permitted by law, each Borrower Party waives and relinquishes . . . (n) all rights of subrogation, reimbursement, indemnity and contribution, all rights to enforce any remedy that Lender may have against any other Borrower Party, as well as any defense to an action to enforce this Agreement based upon the impairment or destruction of any subrogation, reimbursement, indemnity, or contribution rights, or of any of the other foregoing rights, that a Borrower Party might have absent the foregoing waiver, and each Borrower Party agrees: (i) not to seek to enforce or to obtain any such right, or to accept any payment from any other person, in violation of the foregoing waiver; and (ii) that any agreement or other understanding at any time entered into with any person granting any such right to any Borrower Party shall be null and void.

(PFF ¶ 81.)

Here, both Mr. Uddo and Mr. DeLuca are "Borrower Parties" under the Promissory Note. They therefore waived any rights they might otherwise have had against one another to

---

[1] Mr. DeLuca was also bound by the terms of the other "Loan Documents," as defined in the Promissory Note. (PFF ¶ 83.) Mr. Uddo's breach of contract claim does not implicate any other Loan Document.

subrogration, reimbursement, indemnity, and contribution. (PFF ¶ 81.) They further agreed not to seek to enforce those rights against each other. (PFF ¶ 81.)

If the merger clause were not enough to extinguish the alleged oral agreement, then Paragraph 15(n) would preclude Mr. Uddo from prevailing on his breach of contract claim. Mr. Uddo can pretend to seek enforcement of an oral agreement, but his damages claim reveals that he really seeks subrogation, reimbursement, indemnification, and/or contribution for having had to pay off the Schwab Credit Line when it was really Mr. DeLuca who borrowed the money. (First Amended Complaint ¶ 62 (seeking damages in "the amount that Mr. Uddo paid to Schwab upon maturity of the loans").) This claim is therefore barred by Paragraph 15(n), regardless of how Mr. Uddo tries to dress it up.

### C.  **The Alleged Oral Agreement Violates the Statute of Frauds.**

Finally, even if there had been an oral agreement, and even if that oral agreement had somehow survived the Promissory Note's merger clause and its various waivers, the oral agreement as described by Mr. Uddo would violate New York's Statute of Frauds.

Under New York's Statute of Frauds, if a contract by its terms cannot be performed within one year of its consummation, it must be made in writing. N.Y. Gen. Oblig. Law § 5–701(a)(1). Under a "plain reading" of the Statute of Frauds, "the provision relates to the performance of the *contract* and not just of one party thereto." *Guilbert v. Gardner*, 480 F.3d 140, 151 (2d Cir. 2007) (quoting *Cron v. Hargro Fabrics, Inc.*, 91 N.Y.2d 362, 368 (1998)) (italics in original). Thus, "full performance **by all parties** must be possible within a year to satisfy the Statute of Frauds." *Id.* (emphasis added).

Here, Mr. Uddo and Mr. DeLuca knew, as they stood in Schwab's lobby, that they were about to enter into a five-year line of credit with Schwab. (PFF ¶ 92.) The Promissory Note

refers to "a line of credit in an aggregate amount outstanding at any one time not to exceed $4,500,000.00 . . . maturing on July 11, 2016[.]" Mr. Uddo contends that the alleged oral agreement called for him to put up the collateral for this five-year line of credit. (PFF ¶ 79.) What that means is that Mr. Uddo, under his own interpretation of the oral agreement, could not fully perform his part of the bargain within one year.

The Schwab Credit Line is distinguishable in this regard from a term loan, which can at least theoretically be paid off within a year, notwithstanding the length of the term or any pre-payment penalties. Mr. Uddo allegedly agreed to pledge his collateral as security for the Schwab Credit Line for five years. Mr. DeLuca could thus draw down the full $4.5 million on Day 1, pay it all back on Day 365, and still expect to have access to the credit line for another four years. That was the agreement he allegedly made with Mr. Uddo, and the agreement was never reduced to writing. (PFF ¶ 93.) Because Mr. Uddo's full performance is not possible within a year, the alleged oral agreement does not satisfy New York's Statute of Frauds and would not be enforceable against Mr. DeLuca even if it were real.

## II.    Mr. Uddo Failed To Prove Any Claim for Fraud or Fraudulent Inducement.

Mr. Uddo's third claim[2] is for fraud. (First Amended Complaint ¶¶ 67-72.) Mr. Uddo alleges that Mr. DeLuca did not disclose to Mr. Uddo that he was insolvent in July 2011, which was allegedly material to the alleged oral agreement between Messrs. Uddo and DeLuca. (*Id.* ¶ 68.) Mr. Uddo further alleges that Mr. DeLuca misrepresented the purpose of the Schwab Credit Line, which was also allegedly material to the alleged oral agreement. (*Id.* ¶ 69.) The fraud claim is explicitly tied to the alleged oral agreement: "Mr. Uddo would not have entered into this oral

---

[2] Mr. Uddo's second claim, for breach of fiduciary duty, is discussed in Section III below, along with his fifth claim, for aiding and abetting breach of fiduciary duty.

contract if he knew that Mr. DeLuca was insolvent, or if he knew Mr. DeLuca's true purpose for obtaining the line of credit." (*Id.* ¶ 71.)

Mr. Uddo's fourth claim is for fraudulent inducement. (First Amended Complaint ¶¶ 73-77.) As pled, it is substantively indistinguishable from Mr. Uddo's third claim—only a few words in a single paragraph (¶ 75) are added, subtracted, or rearranged. As in his third claim, Mr. Uddo alleges that Mr. DeLuca defrauded him into entering the alleged oral agreement. (*Id.*) And

Mr. Uddo's two indistinguishable fraudulent inducement claims fail for a number of reasons, including that: Mr. Uddo was not fraudulently induced to enter into any oral agreement because there was no oral agreement; Mr. Uddo seeks fraud damages that are identical to the damages he seeks for breach of contract; Mr. DeLuca did not misrepresent his intended use of the Schwab Credit Line, and Mr. Uddo cannot assert reasonable reliance on any alleged omission concerning Mr. DeLuca's financial status in July 2011.

### A. There Is No Cause of Action for Fraudulent Inducement To Contract Where There Is No Contract.

For the reasons stated above, there was no oral agreement between Mr. Uddo and Mr. DeLuca. Mr. Uddo's third and fourth claims, for allegedly having been fraudulently induced to enter into an oral agreement with Mr. DeLuca, therefore fail right out of the gate.

### B. Mr. Uddo's Fraud Claims Seek Identical Damages to His Contract Claim and Should Therefore Be Dismissed.

Assuming, for the sake of argument, that there was an oral agreement, Mr. Uddo's fraud claims fail because he seeks identical damages for those claims that he seeks for his breach of contract claim. The damages that Mr. Uddo allegedly suffered as a result of the alleged fraud is the amount that he paid to Schwab upon maturity of the Schwab Credit Line. (First Amended Complaint ¶¶ 72, 77.) These are exactly the same damages that Mr. Uddo allegedly suffered as a

result of Mr. DeLuca's alleged breach of the alleged oral agreement. (*Id.* ¶ 62.) In fact, Mr. Uddo does not even bother to write out his alleged damages on either of his fraud claims—instead, in Paragraphs 72 and 77, he merely refers back to Paragraph 62, in which he sets out his alleged damages from the alleged breach of contract.

It is a well settled, often repeated principle of New York law that a party may not assert a fraud claim seeking damages that are identical to the damages recoverable on a cause of action for breach of contract. *See*, *e.g.*, *MBIA Ins. Corp. v. Credit Suisse Secs. (USA) LLC*, 165 A.D.3d 108, (1st Dep't 2018) ("It has long been the rule that parties may not assert fraud claims seeking damages that are duplicative of those recoverable on a cause of action for breach of contract."); *Triad Int'l Corp. v. Cameron Indus., Inc.*, 122 A.D.3d 531, 531-32 (1st Dep't 2014) (affirming dismissal of fraud claim where the damages sought on the fraud claim were duplicative, explaining that "plaintiff seeks the same compensatory damages for both claims.... Its purported fraud damages are actually contract damages"); *Mosaic Caribe, Ltd. v. AllSettled Group, Inc.*, 117 A.D.3d 421, 422–423 (1st Dep't 2014).

Mr. Uddo's counsel has reported on this well-settled principle in numerous instructive blog posts. In "Fraud Claim Dismissed as Duplicative of Contract Claim: No Separate Damages Alleged," for example, Mr. Uddo's counsel reported on *TJ PRP LLC v. Rag & Bone Holdings LLC*, 2018 NY Slip Op. 31880(U), in which the New York Supreme Court held that "[w]hen a fraud claim would only entitle the plaintiff to the very same damages that are recoverable on its breach of contract claim, the claim should be dismissed as duplicative."[3] Another blog post, also titled "Fraud Claim Dismissed as Duplicative of Contract Claim," reports on *Board of Managers*

---

3 https://www.schlamstone.com/fraud-claim-dismissed-as-duplicative-of-contract-claim-no-separate-damages-alleged/ (last visited on August 9, 2019).

*of 250 Bowery Condominium v. 250 VE LLC*, 2018 NY Slip Op. 31168(U), in which the New

York Supreme Court held that "plaintiff makes no argument as to how its fraud damages are

different from its breach of contract damages claim. Therefore, plaintiff's fraud-based cause of

action must be dismissed as duplicative of its breach of contract cause of action."[4]

Courts restate this well-settled principle as frequently as they do because plaintiffs, like

Mr. Uddo here, frequently try to repackage breach of contract claims as fraud claims. New

York's Appellate Division, First Department, recently reconfirmed the impropriety of that

strategy in *MBIA Ins. Corp.*, where it stated:

> [F]raud damages are meant to redress a different harm than damages on a cause of
> action for breach of contract. Contract damages are meant to restore the
> nonbreaching party to as good a position as it would have been in had the contract
> been performed; fraud damages are meant to indemnify losses suffered as a result
> of the fraudulent inducement. Where all of the damages are remedied through the
> contract claim, the fraud claim is duplicative and must be dismissed.

*MBIA Ins. Corp.*, 165 A.D.3d at 161 (citing, *inter alia*, *Manas v. VMS Assoc., LLC*, 53 A.D.3d

451, 454 (1st Dep't 2008)); *see also Empire Outlet Builders LLC v. Construction Resources*

*Corp. of New York*, 170 A.D.3d 582, 582-83 (1st Dep't 2019) (affirming dismissal of fraud claim

where plaintiff would be "fully compensated" through contract claim).

Mr. Uddo's third and fourth claims here present the purest example possible of alleged

fraud damages that are identical to alleged contract damages. Mr. Uddo's alleged fraud-based

damages are so thoroughly duplicative that the First Amended Complaint does not even write

them out—the third and fourth claims merely refer back to Mr. Uddo's alleged contract damages.

(First Amended Complaint ¶¶ 62, 72 ("As a result, Mr. Uddo suffered damages as stated in

---

[4] https://www.schlamstone.com/fraud-claim-dismissed-as-duplicative-of-contract-claim-3/ (last
visited on August 9, 2019).

paragraph 62 above."), and 77 ("As a result, Mr. Uddo suffered damages as stated in paragraph 62 above.").

For this reason, Mr. Uddo's third and fourth claims should have been dismissed on a pre-answer motion, or on summary judgment at the latest. That they survived through a three-day trial merely wasted time for Mr. Uddo, the DeLucas, the Court, and everyone else involved.

### C.   Mr. Uddo Failed To Prove any Actionable Misrepresentation or Omission by Mr. DeLuca.

Even if Mr. Uddo's alleged fraud-based damages were not identical to his alleged contract-based damages, his fraud-based claims would fail because he failed at trial to prove any actionable affirmative misrepresentation or omission by Mr. DeLuca.

"Under New York law, the five elements of a fraud claim must be shown by clear and convincing evidence: (1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock and Co., Inc.*, 43 F.3d 230, 234 (2d Cir. 2006) (citing *Schlaifer Nance & Co. v. Estate of Warhol,* 119 F.3d 91, 98 (2d Cir.1997)).

Mr. Uddo bases his fraud claims, in part, on his allegation that Mr. DeLuca affirmatively misrepresented that he intended to use the Schwab Credit Line to finance the purchase of land and the construction of new homes. (First Amended Complaint ¶¶ 69, 74.) Mr. Uddo failed to prove at trial that this representation—which he himself adopted on two forms that he signed under threat of criminal penalties—was even untrue, let alone that he reasonably relied on it to his detriment.

The only other basis for Mr. Uddo's fraud claims is his allegation that Mr. DeLuca omitted to disclose to Mr. Uddo that he had substantial prior debts and/or was insolvent in July

2011. (First Amended Complaint ¶¶ 68, 74.) Again, Mr. Uddo cannot prove that he reasonably

relied on this alleged omission to his detriment.

### 1. Mr. DeLuca Did Not Misrepresent His Intended Use of the Schwab Credit Line.

With regard to Mr. DeLuca's intended use of the Schwab Credit Line, Mr. Uddo failed to

meet the first element of his fraud claims: he did not prove, by clear and convincing evidence,

that Mr. DeLuca intended to use the Schwab Credit Line for anything other than "buying

properties and constructing homes," as he and Mr. DeLuca understood that phrase in July 2011.

There was substantial trial testimony about the DeLucas' outstanding debts as of July

2011, including debt owed to various family members. As is demonstrated in the Proposed

Findings of Fact, however, the only family members who got repaid out of the Schwab Credit

Line were the Uddos. And that fact presents an insurmountable issue for Mr. Uddo on the

question of whether he was defrauded by Mr. DeLuca. In short:

- Mr. Uddo and Mr. DeLuca both understood and expected that they would use the Schwab Credit Line to repay the $600,000 that the DeLucas then owed the Uddos.

- Mr. Uddo and Mr. DeLuca both signed two documents containing the statement that they intended to use the Schwab Credit Line to purchase properties and build homes.

- Yet neither Mr. Uddo nor Mr. DeLuca disclosed to Schwab that they both intended for Mr. DeLuca to immediately draw down the Schwab Credit Line to pay $600,000 back to the Uddos.

- Mr. Uddo could provide no credible reason that it was all right for him to withhold his intentions from Schwab, but somehow an actionable fraud for Mr. DeLuca to allegedly withhold his intentions from Mr. Uddo.

(PFF ¶¶ 51, 73, 86-88.)

The only plausible explanations for Mr. Uddo's behavior in July 2011 are (1) that Mr.

Uddo is a fraudster, and acted *in pari delicto* with Mr. DeLuca in making the same kind of

misrepresentations for which he now seeks to hold Mr. DeLuca liable; or (2) Mr. Uddo understood in July 2011 that "buying properties and constructing homes" fairly captured the gist of Mr. DeLuca's intention to use the Schwab Credit Line in the operation of his homebuilding businesses, even where the operation of his businesses entailed activities—like repaying the Uddos—that were not strictly captured by the phrase "buying properties and constructing homes." In either case, Mr. Uddo cannot credibly claim that he thought "buying properties and constructing homes" was a complete encapsulation of Mr. DeLuca's plans for the Schwab Credit Line.

Importantly, apart from the $600,000 payment to himself and his wife, Mr. Uddo failed to prove, by clear and convincing evidence, that Mr. DeLuca actually used the Schwab Credit Line to pay off any other prior debt, contrary to the purposefully misleading testimony of Mr. Uddo's professional testifying expert, Dr. Eric A. Kreuter. This is also explained in the Proposed Finding of Fact:

- Of the $563,750 that Dr. Kreuter falsely claims the DeLucas used to pay off their prior debts, at least $401,250 is attributable to proceeds from the sale of the so-called Lindenwood Property—not the Schwab Credit Line.

- Another $137,500 was used to pay for expenses incurred in connection with the Lindenwood Property. If these expenses were actually incurred prior to July 2011, which Mr. Uddo did not prove by clear and convincing evidence, there is nevertheless no dispute that they were incurred in connection with the purchase of property and the construction of homes.

- Which leaves exactly $25,000 in the form of a check that the DeLucas wrote to Mrs. DeLuca's sister and her husband. Assuming, for the sake of argument, that this check was written on Schwab Credit Line funds, which Mr. Uddo did not prove by clear and convincing evidence, it represents about one-half of one percent of the $4.488 million.

- Other than the single $25,000 check, Mr. Uddo failed to introduce any evidence indicating that the DeLucas used any funds from the Schwab Credit Line repay Anthony and Jenny D'Amico, to whom they owed $775,000; Ciriaco and

17

Filomena DeLuca, to whom they owed $150,000; or the Simones, to whom they would have owed $300,00 even after the $25,000 partial payment.

Mr. Uddo similarly failed to prove, by clear and convincing evidence, that the DeLucas spent any substantial portion of the Schwab Credit Line on their own living expenses. Mr. DeLuca explained that his business model is to "pay himself" during a construction project by using a portion of the funds he borrows for certain personal expenses. Mr. Uddo will undoubtedly argue that this is another unforgivable deviation from "buying properties and construction homes." But even if that were true, Mr. Uddo failed to prove, by clear and convincing evidence, how much of the Schwab Credit Line, if any, the DeLucas may have used to pay for their own personal expenses during the Tier 1 period:

- Dr. Kreuter testified that the DeLucas spent $377,805 from the Schwab Credit Line on their own personal expenses during the Tier 1 period.

- Dr. Kreuter repeatedly testified that he derived the total amount Robert and Kimberly spent on their own personal expenses by reviewing bank statements, cancelled checks, and credit card statements.

- Dr. Kreuter further testified that he counted expenses from both personal and business accounts.

- Dr. Kreuter testified that the money the DeLucas spent on personal expenses must have come from the Schwab Credit Line because the DeLucas "started with no money" and "[t]here were no other loans that I could identify, no other income sources that I'm aware of, so ostensibly it had to come from the pool of money and made available by the Schwab line of credit."

- Dr. Kreuter's testimony is not credible. At a minimum, Dr. Kreuter knew that there were substantial funds coming into the RKD Enterprises account during the Tier 1 period—so substantial that the account should have had a balance of over $430,000 heading into Tier 2. To the extent any personal expenses were paid from an RKD Enterprises account, Dr. Kreuter cannot say with any certainty that those funds were drawn from the Schwab Credit Line.

- Dr. Kreuter also acknowledged that he did not know which of the DeLucas—if any—allegedly went to Aruba, or Florida, or the Bahamas, or Copenhagen during the Tier 1 period.

18

- Dr. Kreuter again put his credibility at issue by refusing to acknowledge the implausibility of his team's conclusion, set forth in his own demonstratives, that the DeLucas took identical trips to Aruba, Florida, the Bahamas, and Copenhagen during both the Tier 1 and Tier 2 periods. Dr. Kreuter did acknowledge, however, that he was "not saying with 100 percent that there couldn't have been an error in the analysis[.]"

- Finally, Dr. Kreuter acknowledged that in order to verify the accuracy of his calculations, one would need to review "the same bank statements, cancelled checks and credit card statements that I received." But Mr. Uddo failed to offer a complete set of these bank statements, cancelled checks, and credit card statements into evidence. There is no way for the Court to check Dr. Kreuter's math, and given his demonstrated lack of credibility, his calculations should not be taken at face value.

The evidence presented at trial does not support, by clear and convincing evidence, any finding that Robert and/or Kimberly DeLuca spent $377,805 on personal expenses during Tier 1, or that any of the money they spent on personal expenses was necessarily from the Schwab Credit Line.

In short, Mr. Uddo failed to prove by clear and convincing that Mr. DeLuca misrepresented his intentions regarding use of the Schwab Credit Line in July 2011, or even that he subsequently used the Schwab Credit Line for anything other than buying properties and constructing homes.

### 2. Mr. Uddo Did Not Reasonably Rely on any Omission by Mr. DeLuca Concerning His Financial State in July 2011.

With regard to Mr. DeLuca's purported obligation to disclose his outstanding debts and/or his purported insolvency to Mr. Uddo in July 2011, Mr. Uddo cannot satisfy the reasonable reliance element of his fraud claims. *See Crigger,* 43 F.3d at 234. Mr. Uddo pledged millions of dollars in collateral to secure a loan to Mr. DeLuca without even asking whether Mr. DeLuca had any outstanding debts.

In *Crigger*, the Second Circuit reaffirmed that "[r]easonable reliance entails a duty to investigate the legitimacy of an investment opportunity where 'plaintiff was placed on guard or practically faced with the facts.'" 43 F.3d at 234 (quoting *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 81 (2d Cir.1980), *abrogated in part on other grounds by Peltz v. SHB Commodities,* 115 F.3d 1082, 1090 (2d Cir.1997)). The Second Circuit noted that "[t]he law is indulgent of the simple or untutored; but the greater the sophistication of the investor, the more inquiry that is required." 43 F.3d at 324. "Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." *Id.* (quoting *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 737 (2d Cir.1984). "In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Id.* (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 195 (2d Cir.2003)).

Under these standards, Mr. Uddo's failure even to inquire into Mr. DeLuca's financial state in July 2011 cannot be considered reasonable.

First, Mr. Uddo is an extraordinarily sophisticated person. He has a B.A. in biology from New York University. (PFF ¶ 3.) He formed his own pharmaceutical advertising business specializing in oncology, Uddo & Associates ("U&A"), in the 1960s. (PFF ¶¶ 5-6.) U&A had "tens of millions" in billings and did work for Bristol-Meyers, Johnson & Johnson, and Roche, among other clients. (PFF ¶¶ 7-8.) At one time U&A owned two floors in a Manhattan office building. (PFF ¶ 9.) Mr. Uddo now owns three homes and has a stock portfolio worth "over $50 million." (PFF ¶ 17.) He is the President of a family foundation funded by contributions from

U&A and his own personal trust. (PFF ¶ 18.) It would be hard to find a more sophisticated person than Mr. Uddo.

Second, putting millions of dollars at risk constitutes a substantial transaction even for someone as wealthy as Mr. Uddo.

Third, Mr. Uddo had no agreement with Mr. DeLuca to protect him if this substantial transaction with Schwab went sideways.

Fourth, Mr. Uddo knew, prior to applying for the Schwab Credit Line with Robert, that Robert's business model is to borrow money to purchase property and/or to construct homes and then to pay back the borrowed money when a project closes. (PFF ¶ 64.) If nothing else, Mr. Uddo knew that Mr. DeLuca had borrowed $600,000 **from him** in 2010 and 2011 to purchase properties and finance construction projects.[5]

Fifth, Mr. Uddo was "placed on guard" that things were not going well for Mr. DeLuca in July 2011. *Crigger*, 43 F.3d at 234. Mr. Uddo knew, at a minimum, that Mr. DeLuca owed him $600,000 at that time, including $300,000 that he had just borrowed the month before. (PFF ¶ 65.) Mr. Uddo also knew that Mr. DeLuca needed to access the Schwab Credit Line just to pay him back.

Under these circumstances, Mr. Uddo had a duty to inquire into the circumstances of this substantial transaction. He had a duty to at least ask Mr. DeLuca if he had any other debts. But Mr. Uddo proudly testified that he did not even ask:

> Q.     Given that they still had two loans outstanding with you, weren't you
>        skeptical of their claimed need for even more money?

---

5 Mr. Uddo was also aware that Mimi Neuhaus, a real estate broker on Staten Island, had financed one or more of Robert's construction projects.

A.      No. I trusted them, you know, **I never asked them anything else. I never asked them to show me statements. I never asked them to show me like they would their income tax returns.** I – I just trusted them. They said that they needed it and I gave it to them, just like I always did.

(PFF ¶ 60.)

Q.      And you had no understanding as to whether he had borrowed money from anyone else in the world to finance his other construction projects, is that correct?

A.      Correct.

Q.      And --

A.      Why would I? They asked me. I trusted them. Why would I? I didn't ask for statements. I didn't ask for income tax. **I didn't ask for anything. I never asked for anything.**

Q.      In fact –

A.      I did it all on good faith. I was betrayed.

Q.      In fact, you never even asked Mr. DeLuca whether he had any outstanding debt before you and Mr. DeLuca went to Charles Schwab to borrow 4.5 million dollars?

A.      Correct.

(PFF ¶ 61.)[6]

Mr. Uddo's willingness to enter into a $4.5 million transaction with literally no questions asked constitutes the opposite of reasonable reliance, and puts a final nail in the coffin of Mr. Uddo's fraud claims.

---

6 Mr. DeLuca confirmed that Mr. Uddo never asked him about any outstanding debt. ("I don't know what he would want to know. He didn't ask me.")

III.   **Mr. Uddo Failed To Prove Any Breach of Fiduciary
       Duty, or the Aiding and Abetting of Any Such Breach.**

Mr. Uddo's two remaining claims, his second and fifth, are for breach of fiduciary duty,

against Mr. DeLuca, and aiding and abetting breach of fiduciary duty, against Mrs. DeLuca.

(First Amended Complaint, ¶¶ 63-66, 78-81.) These claims also fail. There was never any

fiduciary duty owed by Mr. DeLuca to his older, better-educated, wealthier, more successful

uncle, and therefore Mr. Uddo cannot prove either of his remaining claims. These claims also

seek the same damages as Mr. Uddo's breach of contract claim, and fail for that reason as well.

And finally, even if Mr. DeLuca owed a fiduciary duty to Mr. Uddo at some time in the past, and

even if Mr. Uddo had managed to prove an actionable breach of that duty, Mr. Uddo failed

entirely to prove that Mrs. DeLuca aided and abetted any such breach.

The Second Circuit extensively discusses fiduciary relationships in *U.S. v. Chestman*, 947

F.2d 551 (2d Cir. 1991). Some relationships are "inherently fiduciary," like the relationships

between "attorney and client, executor and heir, guardian and ward, principal and agent, trustee

and trust beneficiary, and senior corporate official and shareholder." *Id.* at 568. "Mere kinship

does not of itself establish a confidential relation. . . . Rather, the existence of a confidential

relationship must be determined independently of a preexisting family relationship." *Id.* (quoting

*U.S. v. Reed*, 601 F. Supp. 685, 706 (S.D.N.Y. 1985), *rev'd on other grounds*, 773 F.2d 477 (2d

Cir. 1985)). A fiduciary relation "exists when confidence is reposed on one side and there is

resulting superiority and influence on the other." *Id.* (quoting *Mobil Oil Corp. v. Rubenfeld*, 72

Misc.2d 392, 400 (N.Y. Civ. Ct. 1972)).

Two longer passages from *Chestman*, each of which quotes another authority, are

particularly helpful here:

23

> One acts in a "fiduciary capacity" when "the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part."

*Id.* at 568-69 (quoting Black's Law Dictionary 564 (5th ed. 1979)).

> A fiduciary relationship involves discretionary authority and dependency: One person depends on the other—the fiduciary—to serve his interests. In relying on a fiduciary to act for his benefit, the beneficiary of the relation may entrust the fiduciary with custody over property of one sort of another. Because the fiduciary obtains access to this property to serve the ends of the fiduciary relationship, he becomes duty-bound not to appropriate the property for his own use.

*Id.* at 569 (quoting Restatement (Second) of Agency § 395 (1958)).

Applying all of these principles here, it is plain that there was never a fiduciary relationship between Mr. Uddo and Mr. DeLuca. They do not share one of the "inherently fiduciary" relationships. Because "mere kinship" is not enough, they are not fiduciaries merely by virtue of Mr. Uddo having married into the same family into which Mr. DeLuca married. And while Mr. Uddo repeatedly testified that he "trusted" Mr. DeLuca, there is no evidence that Mr. Uddo reposed unusual confidence in Mr. DeLuca, and certainly not to a degree that resulted in "superiority and influence" on Mr. DeLuca's side. To the contrary, Mr. Uddo was older, better-educated, and more successful in business than Mr. DeLuca, so that when Mr. DeLuca needed money, he went to Mr. Uddo—not the other way around.

Once the Schwab Credit Line was established, Mr. Uddo and Mr. DeLuca found themselves in the inverse of a fiduciary relationship. Mr. DeLuca was not prohibited from acting for his own benefit or serving his own interests. The entire point of establishing the Schwab Credit Line was to allow Mr. DeLuca to access the funds to capture business opportunities for himself. Mr. DeLuca was not "duty-bound not to appropriate the [credit line] for his own use,"

*Chestman* at 569, as he would have been bound as Mr. Uddo's fiduciary; rather, he was **<u>expected</u>** to appropriate the funds for his own use.

That expectation is utterly inconsistent with Mr. Uddo's stated theory that Mr. DeLuca owed him a duty of "undivided loyalty" that required "the avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." (Plaintiff's Memorandum of Law Regarding Breach of Fiduciary Duty Claim (Dckt. #74) at 7 (quoting *Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466 (1989)). As soon as Mr. DeLuca drew down the first dollar from the Schwab Credit Line and put a shovel in the ground, his interests were potentially in conflict with Mr. Uddo's interests—and that is exactly how the two men understood their relationship would work.

For these reasons, Mr. DeLuca cannot be liable to Mr. Uddo for breach of any fiduciary duty, and Mrs. DeLuca cannot be liable for aiding and abetting the breach of a fiduciary relationship that did not exist.

Mr. Uddo's breach of fiduciary duty claim fails for the additional reason that it is duplicative of his breach of contract claim. As with his fraud claims, Mr. Uddo did not even attempt to plead unique damages from the alleged breach of fiduciary duty. He again referred back to his alleged breach of contract damages (First Amended Complaint ¶ 62) at the conclusion of his claims for breach of fiduciary duty (*id.* ¶ 66) and aiding and abetting breach of fiduciary duty (*id.* ¶ 81). Even if Mr. Uddo could prove that Mr. DeLuca owed him some special duty of care—which he cannot prove—his breach of fiduciary duty claim is still just another way of saying that he was injured by Mr. DeLuca's alleged failure to perform under the alleged oral contract. *See*, *e.g.*, *Snyder v. Wells Fargo Bank, N.A.*, 594 Fed.Appx. 710 (2d Cir. 2014)

(affirming vacatur of jury verdict on breach of fiduciary duty claim because it rested on the same purportedly failed duty as breach of contract claim).

## <u>CONCLUSION</u>

For all of the reasons stated above, the Court should rule in Defendants' favor on all of Palintiff's claims.

Dated: New York, New York
      August 9, 2019

                       Respectfully submitted,

                       LAW OFFICE OF JUDD R. SPRAY

                       By:   <u>*s/Judd R. Spray*         </u>
                            Judd R. Spray
                       450 Seventh Avenue, 33rd Floor
                       New York, New York 10123
                       (347) 409-0211
                       *Attorney for Defendants Robert DeLuca and*
                       *Kimberly DeLuca*