UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK



**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ DEC 04 2019 ★

BROOKLYN OFFICE

-------------------------------------------------------- x

PETER UDDO,

                      Plaintiff,

         -against-

ROBERT DELUCA and KIMBERLY
DELUCA,

                   Defendants.

------------------------------------------------------- x

**OPINION & ORDER**

**17-cv-3848 (NG)**

**GERSHON, United States District Judge:**

       Plaintiff Peter Uddo brings this diversity action against defendants Robert DeLuca and

Kimberly DeLuca, on claims of breach of contract, breach of fiduciary duty, fraud, fraudulent

inducement, and aiding and abetting breach of fiduciary duty pursuant to New York state law. A

bench trial on liability and damages was held from July 23, 2019 to July 25, 2019. The following

witnesses testified: (1) Mr. Uddo; (2) Dr. Eric A. Kreuter, plaintiff's forensic accounting expert;

(3) Mr. DeLuca; and (4) Ms. DeLuca. Based on the preponderance of the credible evidence, as

well as the parties' post-trial memoranda, the following are my findings of fact and conclusions of

law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

**I.       Findings of Fact**

       My findings of fact pursuant to Federal Rule of Civil Procedure 52(a)(1) are set forth below

and also in the later sections of this opinion. These findings are drawn from witness testimony at

trial, my careful observation of the witnesses' demeanor and candor, or lack thereof, and the

parties' trial exhibits.

## A. The DeLucas and Their Businesses

Defendants Mr. and Ms. DeLuca are a married couple who have known each other since they were young children living in Brooklyn, New York. Now in their fifties, the DeLucas live on Staten Island, where they have resided for most of their marriage, with the exception of a brief time spent in Florida. Mr. DeLuca has an associate degree from DeVry University in electronics. Ms. DeLuca has taken a few college-level courses but has not received a degree.

Mr. DeLuca describes himself as a builder. He built his first two homes with a friend in 1987 and 1988. Then, in 1988, Mr. DeLuca built three townhouses by himself, thanks to loans from his father and Gateway State Bank (the predecessor to Victory State Bank). It is worth noting that, while Mr. DeLuca repaid this early loan from Gateway State Bank, he never repaid the initial loan from his father. Mr. DeLuca testified that, except for plumbing and electrical work, he used to build the homes himself, but he became a general contractor, subcontracting out nearly all the required work. The building and contracting work was conducted through two businesses, RKD Enterprises and DeLuca Homes of Staten Island.

Although the DeLucas testified that Mr. DeLuca was the sole employee and owner of each company, the evidence established that Ms. DeLuca was an integral player in the two businesses. For example, Ms. DeLuca held herself out to Victory State Bank ("VSB"), where the DeLucas transacted significant business, as an owner and vice-president of the businesses when seeking and signing loans there. Whether or not she was technically an owner, she clearly played a major part in operating the businesses. As she testified, she was responsible for marketing and selling many of the houses which the businesses built. In addition, her testimony that she was merely helping her husband when she wrote checks for the businesses was contradicted by the documentary evidence, including email exchanges where she evidenced her sophisticated knowledge of the

financing of the homes for sale. While I credit that, at times, she did write checks solely at her husband's request, she did far more to support the businesses. Her demeanor on the witness stand confirmed that her testimony was calculated to minimize her involvement even as she provided rather sophisticated challenges to the documents proffered by Mr. Uddo. In short, I find that Ms. DeLuca was intimately involved in the day-to-day operations of Mr. DeLuca's businesses and not merely her husband's helpmate.

### B. The Uddos

Mr. Uddo is an 81-year-old naval veteran who entered the advertising industry after attending college at New York University. After working for advertising agencies, he started his own successful pharmaceutical advertising company that focused on oncology products. He served as the CEO of that company, Uddo & Associates, until he retired in 1998. While Mr. Uddo owns multiple properties, he has never been in the real estate business and has no real estate expertise. He is married to Joyce Uddo.

Ms. DeLuca is the daughter of Joyce Uddo's brother and is thus Mr. Uddo's niece by marriage. Mr. Uddo has known Ms. DeLuca since she was a baby and has known Mr. DeLuca since at least 1998, the year that Mr. and Ms. DeLuca were married. Prior to 2016, Mr. and Ms. Uddo thought of Ms. DeLuca as though she were their own daughter. Prior to 2016, Mr. Uddo and Mr. DeLuca also shared a close relationship. The Uddos even hoped that their own daughter would be lucky enough to marry someone like Mr. DeLuca.

### C. Prior Loans Between the DeLucas and the Uddos

The DeLucas first approached the Uddos to obtain a loan for their businesses, which Mr. Uddo believed were thriving, in 2000. When the Uddos agreed to extend the loan, Mr. DeLuca drew up a promissory note for $200,000, which was signed by Mr. and Ms. DeLuca and Mr. and

Ms. Uddo. The promissory note memorializing the loan indicates that the DeLucas paid back $100,000 of the loan in 2001 and that the Uddos subsequently lent them an additional $150,000. The DeLucas paid back the entire sum without incident.

A decade later, in March 2010, the Uddos again made a loan to the DeLucas, this time in the amount of $300,000, which was sought by the DeLucas for their businesses. The following June, the Uddos loaned the DeLucas an additional $300,000 to help them grow their businesses. Each loan was accompanied by a promissory note drawn up by the DeLucas in which Mr. and Ms. DeLuca were identified as the borrowers, and Mr. and Ms. Uddo the lenders. Mr. Uddo was happy to lend the money to help his family, in large part because he believed the businesses were extremely lucrative. Mr. DeLuca cultivated this belief by driving Mr. Uddo around Staten Island and showing him properties that Mr. DeLuca had built and sold.

### D. The DeLucas' Financial Situation in 2011

As of July 5, 2011, in addition to the outstanding $600,000 owed to the Uddos, the DeLucas testified that they owed $1,250,000 to family members, consisting of $150,000 to Mr. DeLuca's parents, Ciriaco and Filomena DeLuca;[1] $775,000 to Ms. DeLuca's parents, Anthony and Jenny D'Amico; and $325,000 to Ms. DeLuca's sister and her sister's husband, Carolyn and Steve Simone. As of that same date, Mr. Deluca also testified that he owed $250,000 to real estate broker Mimi Neuhaus, $150,000 to Victory State Bank, and $137,000 to myriad sources for work done on completed construction projects. Additionally, the DeLucas' supplemental discovery responses in this matter, which were relied upon by Dr. Kreuter, Mr. Uddo's forensic accounting expert,

---

[1] This loan from 2009 is distinct from the original loan from Mr. DeLuca's father in or around 1988, referenced *supra*.

valued their real estate liabilities in July of 2011 at $1,385,000. In total, I find that the DeLucas owed at least $3,772,000.[2] This figure stands in contrast to the evidence of the defendants' assets.

Specifically, the DeLucas' many personal and business bank accounts contained a total of only $132,750 on July 5, 2011. The value of their real estate properties totaled approximately $2,500,000, the cash value of their life insurance was $50,000, their furniture was valued at $150,000, and their vehicles and construction equipment were valued at $100,000. In sum, the DeLucas had $2,932,750 in assets. Based on this difference of $839,250 between the DeLucas' assets and liabilities and the DeLucas' available funds, I credit Dr. Kreuter's conclusion that, in July of 2011, the DeLucas were both "balance-sheet insolvent" in that their "assets [were] exceeded by the liabilities" and "cash-flow insolvent" in that they were "unable to pay debts as they [came] due, essentially running out of money."

I further find that the DeLucas were aware of their financial situation and intentionally concealed their considerable debts from Mr. Uddo and other creditors. For example, in the personal financial statement prepared for Victory State Bank on March 19, 2011, which was signed by each of the defendants, they failed to identify $1,850,000 in loans to family members. In that same statement, the DeLucas claimed to be $2,050,000 in the black with $350,000 in annual income, despite an adjusted gross income for that year totaling only $104,000. Additionally, I credit Mr. Uddo's testimony that Ms. DeLuca asked him not to disclose his loans to them, or the Schwab line of credit, to other family members and that he was not aware that other family

---

[2] This figure may be even greater. In a March of 2011 personal financial statement signed by both defendants, they indicated that they owed $450,000 on the property at 20 Lindenwood Road, and $450,000 on the property at 29 Colon Avenue. These properties are not identified by the defendants in their discovery responses, even though the testimony at trial established that those properties did not sell until October of 2011 and Spring of 2012, respectively. It is therefore possible that the defendants owed an additional $900,000 in July of 2011.

members had loaned money to the DeLucas. While, at the time, Mr. Uddo believed the request for silence was born out of embarrassment, I infer that it was part of a larger scheme in which the DeLucas sought to hide their outstanding debt from potential lenders, believing that they would be prevented from obtaining more loans if the true amount of their debt were discovered.

In sum, I find that the DeLucas were insolvent in July of 2011 and intentionally withheld and misrepresented their assets and liabilities to Mr. Uddo.

### E. The Agreement

In July of 2011 one or both of the DeLucas again approached Mr. Uddo, seeking a $5,000,000 loan, claiming that they had an opportunity to purchase land and build a tract of homes that would take them "over the top" in Staten Island as builders. Though Mr. Uddo did not have $5,000,000 at hand, he told them that he would be willing to post his approximately $7,000,000 securities portfolio as collateral to help them obtain the loan from a bank. The parties do not dispute that Messrs. DeLuca and Uddo agreed that the prior $600,000 loan from Mr. Uddo would be repaid from the new line of credit, and that this in fact happened. Messrs. DeLuca and Uddo first approached Mr. DeLuca's own bank to obtain the loan, but VSB would not lend against a securities portfolio. As a result, on July 5, 2011, Messrs. DeLuca and Uddo went to Mr. Uddo's bank, Charles Schwab ("Schwab"), and completed an application.

On July 11, 2011, Schwab sent a letter to Mr. DeLuca indicating that the securities portfolio could not support a $5,000,000 line of credit, but that Schwab was willing to extend a $4,500,000 line of credit. After receiving that notice, but before consummating the agreement with Schwab, Mr. Uddo stated to Mr. DeLuca, "now that you guys have this loan, and I'm putting up the collateral, you're responsible to pay it off." Mr. DeLuca responded with "Don't worry, Uncle

Pete." Having received this verbal acknowledgement, Messrs. DeLuca and Uddo then entered Schwab to execute a promissory note to establish the line of credit.

Mr. DeLuca does not dispute that it was his obligation to pay the interest and principal on the Schwab line of credit. Nonetheless, a central issue at trial was whether Mr. DeLuca agreed with Mr. Uddo that he was responsible *to Mr. Uddo* for the repayment of both interest and principal for the Schwab line of credit. Based on the credible evidence presented at trial, I find that he did.

Mr. DeLuca's position can be summarized by his testimony that "I owed the money to Schwab. I didn't owe the money to Mr. Uddo." His counsel, in the post-trial memorandum of law, expanded on this sentiment by arguing that "Mr. Uddo simply pledged his collateral as a favor to Mr. DeLuca and his wife, Defendant Kimberly DeLuca, with no strings attached." Having observed Mr. DeLuca, however, I conclude that he knew what he was saying was not true. Likewise, the history of loans between the parties evidenced that Mr. Uddo was not giving Mr. DeLuca a multi-million-dollar gift; indeed, Mr. DeLuca admitted that he did not believe the collateral used by Mr. Uddo was intended as a gift. In sum, I do not find that Mr. DeLuca believes that any obligation he had was only to Schwab and that Mr. DeLuca had no obligation to Mr. Uddo.

In contrast, I found Mr. Uddo completely candid and credible. Mr. Uddo testified credibly that he and Mr. DeLuca had an oral agreement by which Mr. DeLuca would pay back both the principal and interest so that Mr. Uddo's securities would not be at risk. All of the circumstances surrounding the oral agreement testified to by Mr. Uddo and described above support the truthfulness of his testimony. The collateral was not a gift from Mr. Uddo, and Mr. Uddo himself benefitted only to the extent that Mr. DeLuca paid back $600,000 in loans to Mr. Uddo from the credit line. The remaining $3,900,000 was solely to benefit Mr. DeLuca. Mr. Uddo did not even

have a checkbook for the line of credit. Indeed, the consideration for performance of the agreement was the understanding that Mr. DeLuca would pay back the line of credit and not leave Mr. Uddo holding the bag. In addition to the factors already mentioned, Mr. DeLuca made all regular interest payments on the account, totaling over $650,000—partially performing on his agreement to pay back both principal and interest.

In sum, I find that Messrs. DeLuca and Uddo entered into an oral agreement by which Mr. DeLuca was responsible to Mr. Uddo for repaying the principal and interest on the Schwab line of credit.

### F. The Schwab Line of Credit

Following their agreement, on July 12, 2011, Messrs. Uddo and DeLuca entered Schwab and executed a number of documents in order to secure the line of credit. First, they signed a promissory note for the $4,500,000 line of credit. Second, they executed a pledged asset agreement pursuant to which Mr. Uddo posted $7,000,000 worth of his securities portfolio, which Mr. Uddo held in a trust with Ms. Uddo for the benefit of the Uddos' grandchildren. Finally, at the same time, they executed a statement of purpose form, in which Mr. DeLuca handwrote that the purpose of the credit line was to "purchase land and construct homes."

### G. The Draw Down of the Schwab Line of Credit

In order to establish how the money drawn from the Schwab line of credit was spent by the DeLucas, plaintiff proffered the testimony of a forensic accounting expert, Dr. Eric A. Kreuter. Dr. Kreuter holds a Bachelor of Science degree with a major in accounting, a Master of Arts degree with a major in industrial psychology, and a Ph.D. with a major in clinical psychology. He is a partner in the advisory services group of the public accounting firm, Marks Paneth, LLP, where he performs forensic accounting work. Defendants did not challenge Dr. Kreuter's credentials,

and at trial I found him to be an expert in forensic accounting, specifically in tracing money. Having heard the presentation of evidence, I further find Dr. Kreuter to be credible, candid, and knowledgeable.

Mr. DeLuca began to draw down the line of credit on July 19, 2011. The evidence at trial proved that, in the eight months following that first draw down, referred to by Dr. Kreuter as the "Tier I" period, the DeLucas drew down approximately $4,488,000 of the $4,500,000 line of credit. When drawn from the Schwab credit line, the money was immediately placed into a VSB account ending in 2815, which was a joint personal account held by Mr. and Ms. DeLuca. The funds from the Schwab line of credit were then redistributed to other bank accounts, including those of the DeLucas' businesses.

On July 22, 2011, $600,000 of the Schwab funds were used to repay Mr. Uddo for his prior loans to Mr. DeLuca.[3] Ms. DeLuca wrote two checks from the DeLucas' joint account to the Uddos, enclosing them in an envelope, the outside of which read:

> Dear Uncle Pete & Aunt Joyce,
>
> Enclosed please find 2 checks for $300,000 each. Once again, we do not know how to thank you both for all that you are doing for us! God bless you both.
>
> We love you,
>
> Robert + Kimberly XXOO

(emphasis in original).

---

[3] Defendants make much of Mr. Uddo not alerting Schwab of the agreement to pay Mr. Uddo back $600,000 from the credit line. Counsel for Mr. DeLuca even accuses Mr. Uddo of being "a fraudster" for permitting the omission. But the question before me is not whether Messrs. Uddo and DeLuca defrauded Schwab, but rather whether Mr. DeLuca defrauded Mr. Uddo. As Mr. Uddo's funds were being used as collateral for the line of credit, that the line of credit was used to repay Mr. Uddo is of no moment to that question.

Within the first eight months of the Schwab line of credit, unknown to Mr. Uddo, Mr. DeLuca also repaid $563,750 in prior obligations to others. Beginning on July 20, 2011 and thanks to the influx of cash, Mr. DeLuca paid off numerous loans related to completed projects, whose obligations arose prior to the Schwab line of credit. Specifically, both Mr. and Ms. DeLuca signed checks from RKD Enterprises totaling $137,500 for previously-incurred expenses; Mr. DeLuca paid $151,250 for an existing line of credit at VSB; Ms. DeLuca paid $250,000 to Mimi Neuhaus; and the DeLucas paid the Simones $25,000 in a check signed by Ms. DeLuca with a note indicating that it was repaying partial principal on the $325,000 loan. Additionally, the DeLucas spent $377,805 on personal expenses including their car payments, mortgages, and credit cards.

As for revenue received, during the Tier I period, Mr. DeLuca testified to receiving $505,374 from the sale of the Lindenwood property in October 2011, a $75,000 loan advance from VSB loan, $1,398 from the Comptroller of the State of New York, and $275 from the Commissioner of Finance.[4] I find that, given the timing of the payments on prior debts, the amounts paid, the capital available at the time, and the DeLucas' income during the period (addressed below), the DeLucas used the Schwab line of credit to repay a significant amount of past debts and personal expenses during the Tier I period.

Dr. Kreuter referred to the period following the initial draw down of the Schwab line of credit as the "Tier II" period, encompassing April 2012 through December 2017. Defendants objected to Dr. Kreuter's testimony regarding the DeLucas' spending during the Tier II period based on relevance and prejudice. I permitted the testimony to proceed and reserved judgment. I

---

[4] Counsel for the DeLucas seeks to have the court make an assumption that there "were substantial funds coming into the RKD Enterprises account during the Tier I period," and that, as a result, the Schwab funds were not used to pay off any prior debts—aside from Mr. Uddo's—during the Tier I period. At trial, however, defendants presented no evidence that this was the case, and counsel has not cited to any admissible evidence upon which I could draw this conclusion.

now overrule defendants' objection. I find that the testimony of Dr. Kreuter regarding how the defendants' spent personal and business funds from 2012 through 2017 is relevant to the defendants' use of the Schwab line of credit. That Dr. Kreuter had some difficulty determining exactly which income source paid for each expense speaks more to the deeply problematic way in which the DeLucas comingled their business and personal funds and provided conflicting reports of income and liabilities, than it does to Dr. Kreuter's skill or his ultimate opinions. Moreover, while the testimony of Dr. Kreuter was damaging to the defendants' case, it was not prejudicial as that term is intended by Rule 403 of the Federal Rules of Evidence. I therefore accept Dr. Kreuter's conclusion that, during the Tier II time period, defendants spent $3,189,589 on personal expenses, including vacations for themselves and their children, jewelry, their home mortgages, personal income taxes, and cash withdrawals not otherwise earmarked for business purposes.

All told, defendants spent $3,567,394 on personal expenses from mid-2011 through the end of 2017 (Tiers I and II, together). According to the DeLucas' personal tax returns, for the slightly shorter time period of January 2011 through December 2016, the defendants earned just $898,045, with a single year high of $205,000. Simple arithmetic dictates that the DeLucas spent $2,669,349 more on personal expenses than they earned during roughly the same period.

### H. Other Sources of Revenue

During the period of the Schwab line of credit, Mr. DeLuca took out 33 separate loans ranging from $5,000 to $650,000 from VSB. These loans totalled over six and a half million dollars and the majority matured within a month or two of the origination dates. Many of these loans were secured by the land that was purchased or improved using the loan proceeds, and evidence adduced at trial regarding the VSB loans showed that the purpose of each of them was to purchase and/or develop real property. With the exception of three more recent loans, Mr. DeLuca

paid off every single VSB loan because, as he testified, he understood that he could not continue to borrow money from VSB in the future if he did not do so. And as Ms. DeLuca testified, had they not paid back the loans from VSB, the bank would have foreclosed on the DeLucas' collateral. Mr. DeLuca testified that he used the proceeds from each home sold to pay back VSB for these loans, instead of using that money to repay the principal on the Schwab line of credit. In effect, the loans from VSB appear to have been offset by the DeLucas' home sales. Notably, Mr. DeLuca testified that VSB was "his" bank, and he wanted to remain in their good graces, seemingly in contrast to Mr. Uddo's bank, Schwab. Because Mr. DeLuca does not dispute that the 33 VSB loans were used for the purchase of land and construction of homes, I find that those loans could not have been available to pay for the personal expenses at issue here.

### I. Evidence of Damages

Mr. Uddo testified that, throughout the duration of the credit line, he would check in with Mr. DeLuca to see whether Mr. DeLuca had begun to pay down the principal. Mr. DeLuca responded to these inquiries stating that the money was "tied up" and never informed Mr. Uddo that he could not or would not repay the principal eventually. Thereafter, in May 2016, when the credit line neared its maturity, Mr. DeLuca revealed that he could not repay what he had borrowed. Mr. Uddo testified that, when he confronted Mr. DeLuca about this, Mr. DeLuca told him to "speak to Kimberly," because she "handles the finances and she knows exactly what [they] were doing with the money." When Mr. Uddo called Ms. DeLuca, she informed him of the DeLucas' considerable preexisting debt, which she told Mr. Uddo they had not previously told him about because Mr. DeLuca was "too embarrassed."

Mr. DeLuca asked Mr. Uddo to seek an extension of the loan but, based on this new information, and because Mr. Uddo's collateral was at risk if Mr. DeLuca defaulted on the

repayment, Mr. Uddo paid off the outstanding debt of $4,496,881.92 by selling his securities when the loan matured on July 11, 2016.

Mr. Uddo told Mr. DeLuca that he and Ms. DeLuca would have to repay him that amount. In response, Mr. DeLuca paid a total of $55,000 in five checks from August 2016 through March 2017.[5] Though the checks were written from a joint bank account with Ms. DeLuca, Mr. DeLuca crossed out Ms. DeLuca's name from each check. During the same time period, Mr. DeLuca did not cross out Ms. DeLuca's name from other checks drawn on the same account, even those for expenses solely incurred by Mr. DeLuca. I infer from this behavior that Mr. DeLuca intentionally attempted to remove Ms. DeLuca's name from the checks to cultivate the impression that Ms. DeLuca had nothing to do with the Schwab line of credit.

## II.    Conclusions of Law

### A.  Mr. DeLuca Is Liable to Mr. Uddo for Breach of Contract

To establish a breach of contract claim, a plaintiff must prove "the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages." *JP Morgan Chase v. J.H. Elec. of New York, Inc.*, 69 A.D.3d 802, 803 (2d Dep't 2010). I find that plaintiff met his burden and proved by a preponderance of the evidence that a valid contract existed between Mr. Uddo and Mr. DeLuca, that Mr. Uddo performed his side of the bargain, that Mr. DeLuca breached the oral agreement he entered into with Mr. Uddo by failing to

---

[5] At trial, I reserved judgment on the admissibility of Exhibit 29, which includes these checks, which defendants objected to under Federal Rule of Evidence 408. Though defendants did not move in their post-trial briefing to exclude this exhibit, I have nonetheless considered their trial objection, and I now find that Rule 408 is inapplicable. Mr. DeLuca testified that he never considered the checks to be an offer of settlement and never considered them a compromise of the claims in this case. As he testified, they were provided to Mr. Uddo "to keep the peace." Indeed, I find that these payments were intended to be partial performance of the agreement that Mr. DeLuca was responsible for the repayment of the principal.

repay the principal to Schwab, and that such breach proximately caused plaintiff's injuries. Having breached his agreement with Mr. Uddo to pay back the credit line to Schwab, Mr. Uddo is entitled to damages in the amount he paid back to Schwab at the line of credit's maturity date.

In his post-trial memorandum, Mr. DeLuca argues that there can be no claim for breach of contract because there was no contract with Mr. Uddo to begin with. He argues that his own statement of "Don't worry, Uncle Pete," can only be described as "[i]mpenetrable vagueness and uncertainty," citing *Express Indus. and Terminal Corp. v. New York State Dep't of Transp.*, 93 N.Y.2d 584, 589 (N.Y. 1999) (quoting *Martin, Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (N.Y. 1981)). I disagree. Defendants improperly treat Mr. DeLuca's statement in isolation from the entire context in which it was uttered. The contract was struck right before the parties were to sign the Schwab documents and before Mr. Uddo put up millions of dollars in securities as collateral. By responding to Mr. Uddo that Mr. Uddo should not worry about Mr. Uddo's collateral being used by Mr. DeLuca, I find that Mr. DeLuca manifested assent with sufficient definiteness that he intended to be contractually obligated to *both* Schwab *and* Mr. Uddo.

Mr. DeLuca next argues, unpersuasively, that any oral agreement between the parties was extinguished by the merger and waiver clauses within the promissory note with Schwab. I find, however, that the Schwab agreement does not, as Mr. DeLuca argues, waive any rights Mr. Uddo and Mr. DeLuca may have had against each other.

Mr. DeLuca argues first that the waiver clause of the promissory note explicitly states that plaintiff waived "all rights of subrogation, reimbursement, indemnity and contribution," and expressly agreed "(i) not to seek to enforce or to obtain any such right . . . in violation of the foregoing waiver; and (ii) that any agreement or other understanding at any time entered into with any person granting any such right to [plaintiff] shall be null and void." Promissory Note at ¶

15(n). But Mr. Uddo is not seeking a subrogation right—that is, he is not seeking to step into Schwab's shoes and enforce Schwab's rights. Rather, plaintiff is seeking only to enforce his own rights under his separate oral agreement with Mr. DeLuca. I therefore find that the waiver clause of the promissory note has no effect on the contract between Messrs. DeLuca and Uddo.

Next, Mr. DeLuca argues that the promissory note's merger clause expressly bars any modification that is not contained in a writing signed by plaintiff, Mr. DeLuca, and Schwab. *Id.* at ¶ 21(e) ("[T]his Note and each other Loan Document constitute the entire agreement between the parties with respect to the subject matter hereof and may be modified only by a written instrument executed by Lender and the other parties thereto."). The agreement between the parties and Schwab clearly manifested the agreement to repay Schwab. It constituted the entire agreement between the borrowers and the lender. But it did not purport to encroach on any agreements between the borrowers amongst each other separate from the Schwab agreement, and it did not extinguish any agreements solely among the borrowers for the repayment of the Schwab line of credit. I will not "interpret a contract in a manner that would be absurd, commercially unreasonable, or contrary to the expectations of the parties." *Callahan v. Glob. Eagle Entm't Inc.*, 2019 WL 2325903, at *3 (S.D.N.Y. May 30, 2019).

Finally, Mr. DeLuca argues that any agreement between him and Mr. Uddo is unenforceable under New York's statute of frauds, which requires that, if a contract cannot be performed within one year of its making, it must be made in writing. N.Y. Gen. Oblig. Law § 5-701(a)(1). The statute of frauds is inapplicable where there are "any possible means of performance within one year." *D & N Boening, Inc. v. Kirsch Beverages, Inc.*, 63 N.Y.2d 449, 445 (N.Y. 1984); *Ohanian v. Avis Rent A Car Sys., Inc.*, 779 F.2d 101, 106 (2d Cir. 1985). In this case, I find it was undoubtedly possible for Mr. DeLuca to have performed his part of the oral

agreement within a year. The contract between Mr. DeLuca and Mr. Uddo was that Mr. DeLuca would be responsible for the interest payments and repayment of any principal drawn from the Schwab line of credit. While the term of the credit line was five years, there was no obligation on the part of Mr. DeLuca to continue to utilize the line of credit for that entire period. Mr. DeLuca could have repaid any amount he borrowed (and any accrued interest) within a year and satisfied the oral agreement. As a result, Mr. DeLuca has not met his burden of proving that the oral agreement between the parties is unenforceable by virtue of the statute of frauds.

### B. Mr. DeLuca Is Liable to Mr. Uddo for Fraud

"To prove common law fraud under New York law, a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank*, 57 F.3d 146, 153 (2d Cir. 1995). As described in more detail below, Mr. Uddo proved each of those elements by clear and convincing evidence. *See Leucadia, Inc. v. Reliance Ins. Co.*, 864 F.2d 964, 971 (2d Cir. 1988), *cert. denied*, 490 U.S. 1107 (1989) (*citing Hutt v. Lumbermens Mut. Casualty Co.*, 95 A.D.2d 255 (2d Dep't 1983)) ("Fraud must be proven under the higher 'clear and convincing' evidence standard.").

As an initial matter, based on the credible testimony of Mr. Uddo and the documentary evidence presented, I find that Mr. DeLuca represented to plaintiff that the purpose of the Schwab line of credit was to finance the DeLucas' businesses' purchase of land and the construction of new homes. I also find that Mr. DeLuca in fact used the Schwab line of credit to pay significant personal expenses and to pay off major prior debts.

Though the parties disputed which personal expenses specifically were paid for by the Schwab funds, Mr. DeLuca did not dispute at trial that he always intended to, and did, use the Schwab funds to pay his personal expenses. Mr. DeLuca claimed on the stand that he could not recall whether he told Mr. Uddo of these intentions to use the funds for personal expenses, but I accept Mr. Uddo's testimony that Mr. DeLuca never told him of that intended use. Mr. DeLuca also denied that he used any Schwab funds to repay prior debts, aside from the $600,000 payment to the Uddos. Based on the timing and the available funds in the DeLucas' accounts, I have found that the Schwab funds were used to repay hundreds of thousands of dollars in prior indebtedness.

Because the Schwab funds were used to pay back prior loans and to fund the DeLucas' personal expenses, and because the Schwab line of credit was drawn down rapidly within the first eight months, I find that Mr. DeLuca's representations to Mr. Uddo that the funds would be used to purchase land and construct new homes were false and that Mr. DeLuca knew that they were false at the time that they were made. I further find that Mr. DeLuca made the knowingly false misrepresentations with the intent to induce Mr. Uddo to give him access to the millions in collateral. These misrepresentations are material as they are facts that a reasonable person would no doubt have considered important in deciding whether to enter into the agreement. For example, it is not credible that Mr. Uddo would have staked seven million dollars in collateral for Mr. Uddo to live beyond his means or to pay back hundreds of thousands of dollars in pre-existing loans to other individuals.

With regard to Mr. Uddo's reliance, the parties all agree that there was a strong, well-founded history of trust between the Uddos and the DeLucas. Not only were they related, but the Uddos had twice previously loaned money to the DeLucas, and those loans were repaid in a timely manner. Mr. Uddo was a businessman whose work was built on trusting relationships. Mr.

DeLuca was aware of Mr. Uddo's trusting nature and the history between them and exploited these factors to the DeLucas' benefit. I find that Mr. Uddo reasonably relied on Mr. DeLuca's representations that the funds would be used for buying properties and constructing homes, as opposed to being used for personal spending or past debts.

Mr. DeLuca claims that Mr. Uddo was "placed on guard" that things were not going well for Mr. DeLuca's businesses in July of 2011, based on the money Mr. DeLuca already owed to Mr. Uddo and the large sum of money he was intending to borrow. Mr. DeLuca then argues that Mr. Uddo conducted no due diligence, and, as a result, his reliance on the claimed misrepresentation was not justifiable. I credit Mr. Uddo's testimony that Mr. DeLuca told Mr. Uddo that the additional funds were needed, not because Mr. DeLuca's businesses were in danger, but because Mr. DeLuca was planning to grow his businesses by purchasing a large tract of land and needed additional capital to do so. I find, in any event, that, given Mr. DeLuca's demonstrated history of falsifying loan applications and obscuring the truth of his indebtedness, no amount of investigation would have revealed Mr. DeLuca's financial situation.[6] *See Frame v. Maynard*, 83 A.D.3d 599, 603 (1st Dep't 2011); *Andersen ex rel. Andersen, Weinroth & Co., L.P. v. Weinroth*, 48 A.D.3d 121, 136 (1st Dep't 2007).

Weighing all of these facts and circumstances, and in light of the totality of the credible evidence, I find that plaintiff proved by clear and convincing evidence that Mr. DeLuca knowingly

---

[6] At trial, Mr. DeLuca invoked the Fifth Amendment to the United States Constitution in response to questions about loan applications he submitted to VSB. As this is a civil matter, Mr. DeLuca's invocation of the Fifth Amendment may be used against him and I am permitted, as the finder of fact, to draw an adverse inference from the assertion of the privilege. *See Baxter v. Palmagiano*, 425 U.S. 308, 318 (1976); *Brink's v. New York*, 717 F.2d 700, 709 (N.Y. 1983). Given that the questions to which he pleaded the Fifth Amendment involved allegations of lying in loan applications by hiding or obscuring his liabilities and assets during the same time period at issue to this litigation, I find that Mr. DeLuca's failure to answer those questions is relevant to the inquiry here and draw an adverse inference from its invocation.

made false material representations of fact to Mr. Uddo upon which Mr. Uddo reasonably relied, and which proximately caused plaintiff's injuries.

### C. Mr. DeLuca Is Liable to Mr. Uddo for Fraudulent Inducement

To state a claim for fraudulent inducement under New York law, a plaintiff must allege a misrepresentation or material omission, on which the plaintiff relied, that induced plaintiff to enter into an agreement. *Barron Partners, LP v. LAB123, Inc.*, 593 F. Supp. 2d 667, 670 (S.D.N.Y. 2009). The misrepresentation or omission must be "either known by defendant to be untrue or recklessly made, which is offered to deceive and to induce the other party to act upon it . . ." *Suez Equity Inv'rs, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 104 (2d Cir. 2001). Finally, a plaintiff must allege that he both reasonably relied on the misrepresentation or omission and that he suffered resulting damages. *Silverman v. Household Fin. Realty Corp. of New York*, 979 F. Supp. 2d 313, 319–20 (E.D.N.Y. 2013). As with the claim for fraud, each element must be proven by clear and convincing evidence. *See Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 447 (E.D.N.Y. 2013). Here, the alleged omission is the failure of Mr. DeLuca to disclose his financial insolvency to Mr. Uddo. Nondisclosure of a material fact only becomes actionable where a defendant has a duty to disclose, *see, e.g., E.B. v. Liberation Publs., Inc.*, 7. A.D.3d 566, 567 (2d Dep't 2004), which can arise where, as here, there is a fiduciary relationship between the parties.[7] *Cty. of Westchester v. Welton Becket Assoc.*, 102 A.D.2d 34, 50–51 (2d Dep't 1984).

Mr. Uddo proved at trial by clear and convincing evidence that Mr. DeLuca was financially insolvent, under any definition of the term, and that Mr. DeLuca did not disclose this information to Mr. Uddo, despite being aware of it. As I already found, *supra*, Mr. DeLuca's financial situation

---

[7] *See* Section D, *infra*, for a full analysis establishing the fiduciary relationship between Messrs. Uddo and DeLuca.

was not known to Mr. Uddo, and could not have been discovered by Mr. Uddo through the exercise of reasonable diligence and ordinary intelligence thanks to Mr. DeLuca's pattern of deceit. I further find that Mr. DeLuca deliberately failed to disclose his true financial situation because he knew that Mr. Uddo would not have agreed to pledge his assets in exchange for the Schwab line of credit if Mr. Uddo knew of it.

Notably, Mr. DeLuca's trial testimony that he did not believe that Mr. Uddo would be interested in knowing that Mr. DeLuca owed hundreds of thousands of dollars to his family and his wife's family prior to the Schwab line of credit was utterly implausible. Documentary evidence established conclusively that Mr. DeLuca was a frequent borrower at VSB. As a result, Mr. DeLuca frequently filled out loan applications which asked a multitude of questions about Mr. DeLuca's assets and liabilities. As stated elsewhere, I find that Mr. DeLuca frequently falsified his applications by hiding his liabilities, including the many substantial family loans. From these facts I draw the inference that Mr. DeLuca knew that lenders were interested in the proportion of his assets to liabilities, and that a poor ratio of these would lead to a loan application being rejected. Indeed, Mr. DeLuca admitted at trial that, if his own money were on the line, he would want to know whether the person using that collateral was "up to their eyeballs in debt."

I therefore find that plaintiff proved by clear and convincing evidence that Mr. DeLuca committed the tort of fraud in the inducement and that it proximately caused plaintiff's injuries.

### D. Mr. DeLuca Is Liable to Mr. Uddo for Breach of Fiduciary Duty

Prior to trial, I directed the parties to address the breach of fiduciary duty claim so that, for purposes of preparing the jury charge, I would understand how plaintiff thought he could meet the standard of such a claim. Candidly, I had some skepticism as to whether plaintiff could meet that standard because, generally, a breach of contract claim and a breach of fiduciary duty claim are

duplicative; and the breach of fiduciary duty claim must be dismissed unless "apart from the terms of the contract, the parties created a relationship of higher trust than would arise from [their contracts] alone." *Brooks v. Key Trust Co. Nat'l Ass'n*, 26 A.D.3d 628 (3d Dep't 2006) (emphasis and alteration in original) (citations and internal quotation marks omitted). Based upon the credible trial evidence, I find that Mr. DeLuca owed a fiduciary duty to Mr. Uddo apart from the terms of their oral agreement.[8] *See Regan v. Conway*, 768 F. Supp. 2d 401, 411 (E.D.N.Y. 2011). Moreover, I am now satisfied that plaintiff overwhelmingly established that Mr. DeLuca breached that fiduciary duty, causing damages.

A fiduciary relationship is "founded upon trust or confidence reposed by one person in the integrity and fidelity of another." *Braddock v. Braddock*, 60 A.D.3d 84, 88-89 (1st Dep't 2009) (citation omitted). Whether two parties are in a fiduciary relationship turns on whether one of them "reposes special confidence and trust" in the other and "reasonably relies on such party to act in his or her best interest." *Orange Cty. Legislature v. Diana*, 968 N.Y.S.2d 319, 340 (N.Y. Sup. Ct. 2013); *see also Schneiderman ex rel. People v. Lower Esopus River Watch, Inc.*, 975 N.Y.S.2d 369 (Table) (N.Y. Sup. Ct. 2013) ("fiduciary relationship arises when a party reposes trust in another to carry out certain duties and the other party agrees to accept that delegation of trust and carry out those duties"). A family relationship between parties is "not determinative" of whether there is a fiduciary relationship between those parties. *See Perrone v. Amato*, 2017 WL 2881136, at *34 (E.D.N.Y. July 5, 2017). But it is "relevant" to whether there is a fiduciary

---

[8] Indeed, the same "conduct amounting to breach of a contractual obligation may also constitute the breach of a duty arising out of the relationship created by contract which is nonetheless independent of such contract," e.g., a separate fiduciary duty. *Bullmore v. Ernst & Young Cayman Islands*, 45 A.D.3d 461, 463 (1st Dep't 2007). So as long as the source of the fiduciary duty is independent of the contract, a fiduciary duty claim is not duplicative of a contract claim even if the same conduct gives rise to a breach of both duties. *See Sally Lou Fashions Corp. v. Camhe-Marcille*, 300 A.D.2d 224, 225 (1st Dep't 2002).

relationship, because family members often repose greater confidence and trust in each other than they do in others, and family members "certainly may by their conduct become fiduciaries." *U.S. v. Chestman*, 947 F.2d 551, 558 (2d Cir. 1991). Moreover, a fiduciary duty may be found where "there is resulting superiority and influence on the other." *Chestman*, 947 F.2d at 558 (quoting *Mobil Oil Corp. v. Rubenfeld*, 72 Misc.2d 392, 400 (N.Y. Civ. Ct. 1972)).

Here, in addition to being in a close, familial relationship with Mr. Uddo, Mr. DeLuca held himself out as an expert in the field of land acquisition and construction. He had considerably superior knowledge and experience in that area, and he relied on that, plus his close kinship with Mr. Uddo, to induce Mr. Uddo to trust him and extend him the collateral for the Schwab line of credit. While Mr. DeLuca attempts to couch himself as a poorly educated rube in comparison to his wealthy and sophisticated uncle, this attempt is belied by the terms of the parties' prior promissory notes. In the promissory notes drafted for the March 2010 and June 2011 loans between the Uddos and the DeLucas, the notes state that "in lieu of interest, borrower will provide real estate consultation services." Otherwise, interest on the notes would accrue at a rate of 8% per annum, which on loans of $600,000 would total $48,000 for a single year. I therefore find that Mr. DeLuca held himself out as a real estate expert and valued his consultation services to his uncle accordingly. Testimony at trial further established that Mr. DeLuca had helped Mr. Uddo's family on many occasions with real estate and construction needs.

Mr. DeLuca was keenly aware of the amount of trust Mr. Uddo was placing in him, and not only accepted that confidence, but courted it. Mr. DeLuca leveraged the trust Mr. DeLuca placed in him to convince Mr. Uddo to pledge his assets so that Mr. DeLuca could obtain the credit line. This is sufficient to establish a fiduciary duty on the part of Mr. DeLuca to Mr. Uddo. Defendants argue that, because the purpose of the arrangement was to benefit the DeLucas, the

fiduciary relationship flowed in the other direction. I disagree. In effect, Mr. Uddo trusted Mr. DeLuca with over seven million dollars of his own securities.

Having established that Messrs. Uddo and DeLuca were in a fiduciary relationship, I find that Mr. Uddo proved by a preponderance of the credible evidence that Mr. DeLuca breached his fiduciary duty to Mr. Uddo by failing to disclose his insolvency to Mr. Uddo, by failing to disclose the true purpose of the credit line, and by using the line of credit for purposes different from those he initially represented, and finally, that such breach proximately caused plaintiff's damages.

### E. Ms. DeLuca Is Liable to Mr. Uddo for Aiding and Abetting Breach of Fiduciary Duty

The elements for aiding and abetting a breach of fiduciary duty in New York are: "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that the plaintiff suffered damages as a result of the breach." *Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1115 (2d Cir. 1986); *accord In re Sharp Int'l Corp.*, 403 F.3d 43, 50 (2d Cir. 2005). As I have found Mr. DeLuca breached his fiduciary duty to Mr. Uddo and that Mr. Uddo was damaged as a result of that breach, the first and third prongs are met, leaving only the second prong to be resolved.

At the outset, one who aids and abets a breach of fiduciary duty may be liable even if she has no independent fiduciary duty to the allegedly injured party. *Sanford/Kissena Owners Corp. v. Daral Properties, LLC*, 84 A.D.3d 1210 (2d Dep't 2011). On the other hand, a claim that a defendant knowingly induced or participated in a fiduciary breach necessarily fails if the defendant did not know of the fiduciary duty. *People ex rel. Cuomo v. Coventry First LLC*, 13 N.Y.3d 108 (N.Y. 2009). I find, based on the credible evidence presented at trial, that Ms. DeLuca was aware of her husband's fiduciary duty to Mr. Uddo.

Ms. DeLuca's knowledge of the Schwab loan cannot seriously be contested. Indeed, I credit Mr. Uddo's testimony that Ms. DeLuca was involved in the efforts to obtain the money from him. It is she who is the niece of Mr. Uddo, who adored her, and she knew that a significant reason Mr. Uddo helped Mr. DeLuca obtain the Schwab line of credit was their family relationship. I find that, although she did not attend the Schwab line of credit closing on July 12, 2011, she was aware that Mr. Uddo had posted $7,000,000 of his securities portfolio to obtain the Schwab line of credit and that it was Mr. DeLuca's responsibility to repay both the interest and the principal. I further find that she was fully aware that the credit line was obtained for the purpose of allowing the businesses to grow. As such, Ms. DeLuca was aware of Mr. DeLuca's fiduciary duty to Mr. Uddo.

But knowledge and inaction are not enough. *See Smallberg v. Raich Ende Malter & Co. LLP*, 140 A.D.3d 942 (2d Dep't 2016). A person knowingly participates in a breach of fiduciary duty only when she provides substantial assistance to the primary violator. *Schroeder v. Pinterest Inc.*, 133 A.D.3d 12, 17 (1st Dep't 2007). Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur. *See State Workers' Compensation Bd. V. Wang*, 147 A.D.3d 104 (3d Dep't 2017). The evidence at trial established that Ms. DeLuca substantially assisted Mr. DeLuca in his breach of fiduciary duty to Mr. Uddo by concealing their insolvency from Mr. Uddo and knowingly using the Schwab funds to pay for personal expenses and to pay off prior debts that she and her husband incurred.

I find that Ms. DeLuca was an active participant in the DeLucas' businesses and was aware of the DeLucas' financial situation. I reach this conclusion in part based on the income tax returns she signed indicating a paucity of income compared to her family's personal expenses, including

credit card bills, spending at luxury shops, international travel, and tens of thousands of dollars gifted to their son, to help him with a new business. I further base my opinion on the fact that Ms. DeLuca signed the $600,000 checks to pay off the prior loans to the Uddos from the Schwab line of credit, along with a note thanking the Uddos for all that they were doing "for *us*." Moreover, it was she who benefitted from the repayment of the $600,000 loans from Mr. Uddo. The promissory notes on those loans are signed by her as well as by Mr. DeLuca, whereas she is not a signatory on the Schwab credit agreement. Thus, paying off the $600,000 from the Schwab line eliminated her obligation on that sum. She therefore had every incentive to help Mr. DeLuca obtain the aid of Mr. Uddo in getting the $4,500,000. Ms. DeLuca also personally asked her aunt and uncle to not tell any other family members about the line of credit, hoping that none of her family members with outstanding loans would learn of it. In this manner, Ms. DeLuca forestalled Mr. Uddo's discovery of their insolvency and outstanding debts. In sum, she substantially assisted Mr. DeLuca in the breach of his fiduciary duty. No more is required.

### F. Calculation of Damages

Plaintiff proved by clear and convincing evidence that as a result of each claim proven above, he was damaged in the amount of $4,441,881.92. This figure accounts for the $55,000 repaid by Mr. DeLuca from August 2016 to March 2017, as discussed above.

Mr. DeLuca argues, however, that the fraud claims against him should have been dismissed previously because the damages sought were duplicative of the damages sought for the breach of contract claim. As counsel concedes, such a motion for dismissal was not made pre-answer (or at any time when defendants were represented by counsel), nor was such a motion made on summary judgment, either by the defendants *pro se* or when represented by trial counsel. Nonetheless, "parallel fraud and contract claims may be brought if the plaintiff (1) demonstrates a legal duty

separate from the duty to perform under the contract; (2) points to a fraudulent misrepresentation that is collateral or extraneous to the contract; *or* (3) seeks special damages that are unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (emphasis added). Contrary to Mr. DeLuca's protestations, to maintain separate breach of contract and fraud claims, a plaintiff need only assert one of the *Bridgestone/Firestone* factors. I found that Mr. DeLuca owed a fiduciary duty to Mr. Uddo, and thus, plaintiff's fraudulent inducement claim meets the first independently sufficient *Bridgestone/Firestone* factor. With regard to the fraud claim based on Mr. DeLuca's misrepresentations to Mr. Uddo that he would use the Schwab funds solely for buying land and building homes, I find that these misrepresentations were collateral or extraneous to the contract, thus satisfying the second *Bridgestone/Firestone* factor. *See AXA Verischerung AG v. New Hampshire Ins. Co.*, 391 F. App'x 25, 27 (2d Cir. 2010) (fraud claim held not duplicative of breach of contract claim where "the challenged factual allegations all constitute misrepresentations 'of present fact, not of future intent[,] collateral to, but which w[ere] the inducement for the contract.'"); *Deerfield Commc'ns Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (N.Y. 1986) ("a promise . . . made with a preconceived and undisclosed intention of not performing it" is "a representation of present fact, not of future intent."). Where, as here, a plaintiff has met two of the *Bridgestone/Firestone* factors, he need not also allege separate damages to maintain separate breach of contract and fraud actions. Therefore, I decline to dismiss the fraud claims as duplicative.

Because plaintiff does not seek duplicative damages for his separate claims, I find that plaintiff is entitled to an award of $4,441,881.92.

### J. Prejudgment Interest

The statutory rate of interest is nine percent per year. N.Y. C.P.L.R. § 5004. Interest is to be calculated from the promissory note's maturity date of July 11, 2016, when Mr. Uddo paid $4,496,881.92 to Schwab, through the date of judgment.

## III.   Conclusion

The Clerk of Court is ordered to enter judgment for plaintiff in the amount of $4,441,881.92, including the calculation of prejudgment interest as described above, against Mr. DeLuca on the claims of breach of contract, fraud, fraudulent inducement, and breach of fiduciary duty, and against Ms. DeLuca for the claim aiding and abetting breach of fiduciary duty. The defendants shall be held jointly and severally liable for the damages awarded.

**SO ORDERED.**

/s/ *Nina Gershon*
**NINA GERSHON**
**United States District Judge**

December 3, 2019
Brooklyn, New York